[No. B187940. Second Dist., Div. Seven. Oct. 11, 2006.]

STEPHANIE STEINERT, Plaintiff and Appellant, v.
CITY OF COVINA et al., Defendants and Respondents.

**COUNSEL**

Lackie & Dammeier, Dieter C. Dammeier and Michael A. McGill for Plaintiff and Appellant.

Liebert Cassidy Whitmore, Richard M. Kreisler and Jennifer R. Hong for Defendants and Respondents.

## OPINION

**ZELON, J.**—Stephanie Steinert, a police officer for the City of Covina whose employment was terminated for misconduct, filed a petition for writ of administrative mandamus alleging that she was denied the protections of the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.[1]) (the Act) while she was being interrogated by her supervisor. The trial court denied her petition, and she appeals. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Steinert was a police officer for the Covina Police Department. Her name arose as part of a routine informal audit performed by the California Department of Justice, which monitors use of its criminal records databases. The Covina Police Department learned from the Department of Justice that Steinert had performed a records search on an individual named Robert Tirado and had designated the search "TRNG," signifying training. Justice Department and Covina policies precluded the use of actual records for training purposes.

The support services manager at the Covina Police Department, Rachel Leo, examined their records for the day that Steinert had run the search in question, and found that Steinert had taken a vandalism report from Wendy Roff at approximately the same time that the record search was conducted. That vandalism report did not mention the name Robert Tirado, but a link between a location on the report and Tirado's rap sheet suggested that there was a possible connection between the victim and Tirado. Leo suspected that Roff had mentioned Tirado while reporting the vandalism and that this had prompted Steinert to run Tirado's criminal history in the course of taking the vandalism report.

Leo furnished this information to Steinert's commanding officer, Sergeant John Curley. Curley believed that it was likely that Tirado's name came up during Roff's vandalism report, even though Steinert had not put Tirado's name into the report. As long as Tirado's name had been mentioned in the context of the report taking, Curley believed, the criminal history search itself was appropriate and the only problem was the "user error" of designating the search as for training rather than entering the crime report number associated with Roff's vandalism report.

---

[1] All further statutory references are to the Government Code.

Later that same morning, Curley called Steinert into his office. She remembered taking the vandalism report and told Curley that Roff had in fact mentioned Tirado when making the report. Roff's statement prompted Steinert to access Tirado's records. Curley instructed Steinert that in the future, she should make sure to include names such as Tirado's as "mentioned persons" in the crime report, and she should use a case number rather than "TRNG" when she performed record searches on individuals. Steinert took the instruction well. Curley asked one more question of Steinert: Had she disclosed any of Tirado's confidential information to Roff? Steinert replied that she had not.

As a supervisor, Curley is required to perform audits of two crime reports per week, contacting the person who reported the crime to inquire whether the department and officer responded courteously and appropriately. Because Curley had already reviewed the crime report generated when Roff reported the vandalism, he decided to use that report as one of the two audited reports for the week. When he contacted victim Roff, she reported that Steinert had disclosed confidential information about Tirado when she made her crime report. With this information, Curley launched an internal affairs investigation of Steinert that ultimately led to her dismissal.

Steinert challenged her dismissal by a petition for writ of administrative mandamus. She requested that the trial court suppress her statements to Curley on the ground that the conversation in which it was elicited was an interrogation that could and did lead to punitive action and that she therefore should have been afforded the protections of the Act. The trial court denied the petition for administrative mandamus. Steinert appeals.

## DISCUSSION

█ The Act protects the rights of police officers by establishing procedures for the interrogation of officers who are "under investigation and subjected to interrogation by [their] commanding officer[s] . . . that could lead to punitive action." (§ 3303.) The statute, however, does not apply to "any interrogation of a public safety officer in the normal course of duty, counseling, instruction, or informal verbal admonishment by, or other routine or unplanned contact with, a supervisor or any other public safety officer." (§ 3303, subd. (i).) This entire matter, therefore, hinges on the nature of the conversation between Steinert and Curley in which she lied to him about releasing Tirado's criminal history to Roff: Was it an interrogation that could

lead to punitive action—in which case she should have been afforded the Act's procedural protections—or was it a routine interrogation in the normal course of duty, counseling, or informal verbal admonishment, such that no violation of her rights occurred?

Relying on the fact that the misdesignation of the search as training violated searching policies, Steinert argued that punishment could have resulted from that action alone and that she was therefore interrogated as part of an investigation into her wrongdoing. Covina, in turn, claimed that there was no intent at all on Curley's part to punish her for the coding error, but merely to use the opportunity as a training moment. The encounter, as a result, was an interaction in the normal course of duty, not a protected interrogation. The trial court found that "[t]he conversation between [Steinert] and Sergeant Curley evidences a routine communication between a supervisor and a subordinate, and was not subject to [Gov. Code, ]§ 3303[, subdivision] (c) requirements." We review the trial court's factual finding that the conversation between Steinert and Curley was a routine communication for substantial evidence. (*Shafer v. Los Angeles County Sheriff's Dept.* (2003) 106 Cal.App.4th 1388, 1396 [131 Cal.Rptr.2d 670].)

Abundant evidence supports the trial court's finding. Leo believed that Steinert "had probably accessed the information for a legitimate reason; that there was a need to access it because the person's name came up in her preliminary investigation of the crime that was being reported to her and that she for some unknown reason just put [']training['] in there instead of the case report, maybe having a lapse of what she needed to put in there . . . ." When Leo informed Curley of the audit report indicating the impermissible use of an actual record for a search designated as training, she told Curley that the search was most likely connected to the crime report that Steinert had taken at the same time and was therefore legitimate.

Curley thought that the report Steinert was taking "could have been one of the reasons why" Tirado's criminal records were accessed. Even though Tirado's name was not in that report, Curley believed that Steinert "could have had a perfectly good reason for running this person's name." Because Steinert was a police officer, as long as she had a need to run the search, the search was proper; the only issue would be the misdesignation of the search as a training search as opposed to the use of the case report number for identification. Curley explained: "[I]t gets back to the right to know and the need to know, and she definitely had the right to know, being a police officer.

And in the case where a name was given to her, she had the need to know in the course of conducting her criminal investigation. A common mistake would be, you know, instead of writing the case number into the query, maybe, you know, employees may not know better and they might use training instead of the case number. The intent or the doing in good faith thinking is what would matter. Putting it as [']TRNG['] versus a specific case number would just be a simple training issue that can be dealt with with employees."

While the proper procedure was to use test records for training and to identify every investigative search with the associated report number, Steinert's mislabeling was not a substantial rule violation in the mind of Curley or Leo.[2] Under certain circumstances, an officer who improperly designated an actual search as training could be subject to a written reprimand. It is not, however, mandatory to issue a written reprimand or more serious punishment every time a rule or regulation is breached. Curley believed that the misdesignation of a proper search and the failure to include the individual's name in a report was exactly the kind of situation that merited not a written reprimand but a verbal direction to correct these procedural problems in the future. In fact, Curley felt that based on the circumstances as he understood them when he spoke with Steinert, he could not have issued her a written reprimand or greater discipline.[3] When asked why, he answered, "My intention was to have a conversation with her dealing with a training issue that I believe was a common mistake that Stephanie made in the course of her duties as a front desk officer, and I didn't feel that the circumstances that I knew at the time, that any of it could lead to any punitive action against her." As Curley noted, "I caught a mistake of using the letters [']TRNG['] instead of a case number. Other than that . . . [s]he didn't do anything wrong." The improper designation "absolutely" could have been properly addressed by a training/educational meeting with him. Curley's position was echoed by Leo, who testified that as long as the research was done for legitimate purposes, "I would take it that all I need to do is retrain her in how to use it properly, end of story."

Curley considered this training to be part of his job as Steinert's supervisor. "[T]his would be a prime example of one using this as a training opportunity to try to educate on how to access the system because it can be complicated.

---

[2] Leo testified that Steinert's misdesignation of the search did not jeopardize Covina's access to the state database, as the Department of Justice would "absolutely not" have restricted the department's access based on the labeling of the search as training. The entire purpose of the audit is "so that we will take care of any problems that we may have in a training capacity."

[3] This view was shared by Leo, who said that after looking into the records, she "was convinced it wasn't a misuse" of the criminal records database.

So I would say that is almost a day-to-day function of a supervisor is [*sic*] to deal with issues just like this and to teach and train newer officers on how to use the system properly." Curley had no intention of issuing a reprimand when he spoke to her because he considered Steinert's conduct a "simple error" and decided "to treat this case as an opportunity to train Stephanie and to give her another perspective on what she should do in the future if somebody provides her a name, for example, this name Robert Tirado as a mentioned party and listing the case number as a reason for accessing files versus the letters [']TRNG['].""

At the time he consulted Steinert, Curley knew no facts that would have caused him to believe that the search itself was improper, or that Steinert had in fact disclosed confidential information improperly. He did not give advisements pursuant to the Act because "that meeting was not likely to result in any punitive action against Stephanie. It was an opportunity to use my powers as a supervisor to train a newer employee." He reiterated, "[I]t was going to be an opportunity to train Stephanie in regards to a common error that was—or an error that was made using the letters [']TRNG['] to access a file that she had a right and a need to know." Curley did not intend to reduce his admonishment to Steinert to writing or to make any written record of the interaction.

Curley spoke with Steinert within a few hours of learning of the records issue. The conversation, a "general casual conversation," took place in Curley's office with the door open. It lasted less than five minutes. Steinert confirmed taking the vandalism report and that Roff had mentioned Tirado's name. Because the search itself was justified, to bring the incident to closure required "[n]othing more than the verbal admonishment of 'next time you may want to include this person, Robert Tirado, as a mentioned party and use the case number instead of the letters [']TRNG,["]'" and that was the extent of it." Curley said that Steinert was "[v]ery receptive and took the input well." When asked why he advised Steinert what to do in the future, Curley responded, "As a supervisor, it's my responsibility to train new officers in the course of their duties. I mean, common mistakes are made, and I just wanted to have a conversation with her, treat it as a training moment and move on."

During the conversation, Curley asked Steinert if she "gave this information [on Tirado's criminal history] to Wendy Roff or told her—disclosed any of the information or gave her any printouts of the information." Curley

asked the question "in the interest of being thorough, my responsibility as a supervisor." Steinert said that she had not done so. Of course, Curley's subsequent audit of the crime report revealed that Steinert had in fact improperly disclosed information about Tirado to Roff. Had Curley not elected to audit that report and therefore not learned that Steinert had improperly disclosed confidential information about Tirado, the matter would have been resolved. Curley's discovery that Steinert had disseminated confidential information despite denying that she had, not the search designation issue, caused the internal affairs investigation: "The focus of the investigation or allegation was lying to me. It had nothing to do with the conversation that we had about this accessing the information. In my mind, that was a done deal. We had already dealt with that issue."

■ " 'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.]' " (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462 [17 Cal.Rptr.3d 96].) As shown above, the trial court's factual finding that the interaction between Steinert and Curley was a routine conversation between commander and subordinate in the course of duty is supported by substantial evidence. We then apply our independent judgment to the legal question of whether the Act applied. (*Shafer v. Los Angeles County Sheriff's Dept., supra,* 106 Cal.App.4th at p. 1396.) Independently applying the law to the facts as found by the trial court, we conclude that the interaction was an "interrogation of a public safety officer in the normal course of duty, counseling, instruction, or informal verbal admonishment by, or other routine or unplanned contact with, a supervisor," and that by the terms of section 3303, subdivision (i), the Act did not apply.

This case is distinguishable from Steinert's primary authority, *City of Los Angeles v. Superior Court* (1997) 57 Cal.App.4th 1506 [67 Cal.Rptr.2d 775]. In that case, Officer Labio's supervisory officer received a report that a male Filipino officer failed to render aid at the scene of a fatal accident, proceeding instead to a donut shop. (*Id.* at p. 1510.) Departmental records showed that Labio was the only male Filipino officer on duty that night. (*Ibid.*) The donut shop confirmed that a male Filipino officer had been there that evening at about the time of the accident. (*Ibid.*) The commander also learned that Labio did not have permission to use a police vehicle that night. (*Ibid.*)

Armed with this information, Labio's commander called him into his office and questioned Labio about his whereabouts that evening and the use of the police vehicle during his shift. (*City of Los Angeles v. Superior Court, supra,* 57 Cal.App.4th at p. 1510.) At the time of the interrogation, Labio's commander knew that the conduct constituted a serious offense that could lead to discipline, and he already had sufficient information to arrest Labio for a felony. (*Ibid.*) The questioning focused on matters likely to lead to punitive action and had no other purpose, but Labio was not informed that he was under investigation or advised pursuant to the Act. (57 Cal.App.4th at p. 1510.) The Court of Appeal held that under these circumstances the commander's questioning could "only be characterized as part of an investigation of Officer Labio for sanctionable conduct." (*Id.* at p. 1514.) It was not routine or unplanned contact in the normal course of duty: This was not a "routine communication within the normal course of administering the department" (*ibid.*), but the investigative culmination of a commander's substantial investigation and accumulation of enough information to arrest Labio for a felony.

In contrast, here Curley did not have information demonstrating that Steinert had committed a crime, unlawfully accessed Tirado's information, or improperly released Tirado's information to the public. He did not suspect that such misconduct had occurred, believing that the only thing Steinert had done wrong was to designate a search as training instead of by a case number. He had no intention to punish Steinert, only to make sure she knew the proper procedure for future searches. In their brief conversation, Curley instructed Steinert that in the future she should use the case report number and make sure that she mentions the person whose name she has run, in the police report. The evidence supports the trial court's conclusion that this was a remedial interaction and not the attempt to tighten the metaphorical noose around an investigated officer's neck that Steinert posits. Because of these significant factual differences, *City of Los Angeles v. Superior Court, supra,* 57 Cal.App.4th 1506, does not control the outcome here.

■ Section 3303, subdivision (i) is designed "to avoid claims that almost any communication is elevated to an 'investigation.' " (*City of Los Angeles v. Superior Court, supra,* 57 Cal.App.4th at p. 1514.) As Steinert was not entitled under these circumstances to the special protections of the Act, the trial court properly refused to suppress the evidence of Steinert's apparent lie to Curley and correctly denied the writ of administrative mandamus.

## DISPOSITION

The judgment is affirmed. Respondent shall recover its costs, if any, on appeal.

Perluss, P. J., and Johnson, J., concurred.