[No. B208682. Second Dist., Div. Five. June 16, 2009.]

ROBERT PATERSON et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

1394

**C**OUNSEL

Law Offices of Geoffrey D. Taylor and Geoffrey D. Taylor for Plaintiffs and Appellants.

Rockard J. Delgadillo, City Attorney, and Paul L. Winnemore, Deputy City Attorney, for Defendants and Respondents.

OPINION

**ARMSTRONG, Acting P. J.**—Appellants Robert and Scarlett Paterson (hereafter R. Paterson or S. Paterson, respectively) are Los Angeles police officers, married to each other. In December 2004, R. Paterson called in sick. A supervisor, Lieutenant Raymond Garvin, suspected that he was not sick, but was abusing sick time. Garvin instructed Sergeant Adrian Legaspi to go to the Paterson home to find out. Legaspi spoke to both appellants, and both were the subject of internal LAPD (Los Angeles Police Department) misconduct complaints alleging that they had made false and misleading statements to Legaspi. Both were temporarily relieved from duty, but were later exonerated by the board of rights. They were reinstated and received backpay for the time of the suspension.

They sued the City of Los Angeles (City), Legaspi, and others.[1] As to the City, the cause of action was violation of the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, §§ 3300–3313),[2] which "requires that law enforcement agencies throughout the state afford minimum procedural rights to their peace officer employees." (*Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 572 [273 Cal.Rptr. 584, 797 P.2d 608], fn. omitted.) In that cause of action, appellants alleged that they were not afforded the protections guaranteed by the Act.[3] The remaining causes of action, intentional infliction of emotional distress and negligent supervision, were brought against both the City and Legaspi and depended on factual allegations about these same events.

Each officer sought a civil penalty of $25,000 for each violation of the Act, citing section 3309.5, subdivision (e), on malicious violations of the Act; punitive damages; damages for emotional distress; and money damages based on the theory that the award of backpay did not make them financially whole. Appellants also sought declaratory and injunctive relief to prevent the City from allowing its own violations of the Act to have a negative effect on them.

The City and Legaspi moved for summary judgment or summary adjudication. As to the tort causes of action, the motion was based on the doctrines of

---

[1] The other defendants were LAPD Chief William Bratton and Lieutenant Garvin, but both were dismissed prior to the rulings at issue here.

[2] All further statutory references are to the Government Code unless otherwise indicated.

[3] The legislation is sometimes referred to as "POBRA" (*Van Winkle v. County of Ventura* (2007) 158 Cal.App.4th 492 [69 Cal.Rptr.3d 809]) or "the Bill of Rights Act" (*Sacramento Police Officers Assn. v. Venegas* (2002) 101 Cal.App.4th 916 [124 Cal.Rptr.2d 666]) or "POBR" (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836 [57 Cal.Rptr.3d 363]). We adopt the usage of the Supreme Court (*Pasadena Police Officers Assn. v. City of Pasadena, supra*, 51 Cal.3d 564), and refer to the legislation as "the Act."

workers' compensation exclusivity and governmental immunity.[4] On the cause of action under the Act, the City contended that the Act only applies where there has been punitive action, and that appellants' exoneration by the board of rights nullified any punitive action, so that the Act did not apply. The trial court granted the motion on all theories and entered judgment for the City and Legaspi.

We find that the City and Legaspi were entitled to summary adjudication on the tort causes of action, which are barred by the doctrine of governmental immunity. However, we reverse the summary adjudication on the cause of action under the Act. The Act applies to an investigation and interrogation "that *could* lead to punitive action . . . ." (§ 3303, italics added.) The City's nullification theory has no support in the law.

Nor do we believe that the City is entitled to summary adjudication on its alternate theory, not raised in the trial court. That theory is that as a matter of law, on the undisputed facts (*Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316 [88 Cal.Rptr.2d 758]), Legaspi was engaged only in a "sick check," in the normal course of duty, and asked only "innocent preliminary or casual questions," so that the Act did not apply. (*City of Los Angeles v. Superior Court* (1997) 57 Cal.App.4th 1506, 1514 [67 Cal.Rptr.2d 775]; see § 3303, subd. (i).) The facts at summary judgment are to the contrary, and indicate that Legaspi was engaged in an investigation of suspected wrongdoing.

We thus reverse the judgment and remand with instructions to grant summary adjudication on the tort causes of action in favor of the City and Legaspi and to conduct further proceedings consistent with this opinion.

### Facts

In December 2004, S. Paterson was on "bonding leave," having recently had a baby. On December 4, 2004, R. Paterson called in sick. Under LAPD policy, that call was good for a 48-hour period, but a supervisor, Lieutenant Garvin, suspected that he was not sick, but was abusing sick time. According to Garvin's testimony before the board of rights, his suspicion was based on the fact that R. Paterson's December 4 and 5 sick days were bracketed by days off, and on his mistaken belief that R. Paterson was a frequent user of sick time.

---

[4] The motion also contended that the entire case was barred because appellants failed to timely comply with the claim presentation requirements of the Government Claims Act. Appellants' opening brief includes an argument on this point, but we do not believe the issue is before us. During the summary judgment proceedings, the City conceded that it waived the defense by failing to serve appellants with notice of rejection of their claims. The City argued that it had not waived the statute of limitations, and asked that in the event that summary judgment was denied, it be allowed to amend its answer to properly plead the statute of limitations, but there was no ruling on either point.

On December 5, Garvin sent Legaspi to the Paterson home. Neither officer was at home when Legaspi arrived. Instead, they were at S. Paterson's brother's apartment, where S. Paterson was helping her brother move and R. Paterson was sleeping in his brother-in-law's apartment upstairs.

Much of the rest of the narrative of the day's events is found in Legaspi's deposition testimony, Garvin's testimony before the board of rights, and documents before the board of rights, all proffered by appellants at summary judgment.

When she set out for the Paterson home, Legaspi took a tape recorder from the station. She turned it on as she walked to the Patersons' front door. R. Paterson's son (a minor), answered the door and gave Legaspi a cell phone number for his father. Standing in front of the Patersons' house, Legaspi called that number. She recorded her own part of the conversation, and appellants presented a partial transcript of the conversation.

S. Paterson answered the phone. Legaspi asked "But he is at home? And this is his wife?" Legaspi then confirmed that S. Paterson was an LAPD officer and confirmed her serial number, and said "And it is confirmed that Officer Paterson is at home asleep sick? Yes, ma'am. Okay. It is now 1:25. And I am ordering you, Officer Paterson, to put your husband on the phone instantaneously."

The transcript in our record does not include Legaspi's conversation with R. Paterson, but it does include Legaspi's call to Garvin, which seems to have taken place immediately after her conversation with R. Paterson.

This portion of the transcript begins with Legaspi saying "Hi. Guess what. Well, his son answered, said he's not home. He gave me his cell phone number. I have it all on tape, the conversation." Legaspi then summarized her conversation with R. Paterson: "He comes on the phone. He goes, 'Hey, Sarge. Yeah. What's up?' And I said, Officer Paterson, I'm verifying your sick status. It's my understanding you are at home. You are upstairs asleep, or you were.' And he says, 'yes.' And I said, 'Yes, that's correct?' " Legaspi then told R. Paterson, "I am here at your residence . . . you have just given a false and misleading statement to a supervisor."

Appellants also proffered as an undisputed fact that within hours of her return to the station, Legaspi prepared a formal complaint about both appellants, and proffered LAPD's report on the internal affairs investigation of R. Paterson, which consistently refers to statements both appellants made to a supervisor "conducting a legitimate and necessary investigation concerning possible sick time abuse."

The City proposed as undisputed that Legaspi was conducting a "sick check," and proposed that "LAPD policy permits an in-person 'sick check,' which is where a supervisor goes to an officer's home to make sure the officer is okay, but an officer is not required to be at home when he or she is out sick." The definition was not based on any LAPD policy or procedure manual, but on appellants' deposition testimony.

Appellants agreed that supervisors were empowered to go to an officer's house to see whether the officer was okay, but contended that if the purpose was to investigate misconduct, the Act applied. They proposed that Legaspi was not conducting a sick check, but an investigation.

They also proffered a portion of an LAPD manual, titled "Sick and IOD Interviews General." It provides that "a supervisor causing an initial interview or follow-up interview to be conducted shall determine whether the interview is to be accomplished by telephone or in person," then instructs supervisors on that choice. A telephone interview may be conducted when, for instance, the supervisor has prior knowledge of the illness or injury, but must be conducted in person where there is an indication that the sick employee needs assistance (which no one claims here) or where unauthorized use of sick time is suspected.

Discussion

The Public Safety Officers Procedural Bill of Rights Act

■ "The Act requires that law enforcement agencies throughout the state afford minimum procedural rights to their peace officer employees." (*Pasadena Police Officers Assn. v. City of Pasadena, supra*, 51 Cal.3d at p. 572, fn. omitted.) In section 3303, it provides that "When any public safety officer is under investigation and subjected to interrogation by his or her commanding officer, or any other member of the employing public safety department, that could lead to punitive action, the interrogation shall be conducted under the following conditions. . . ." (§ 3303.) "To ensure fair treatment of an officer during an internal affairs interrogation, section 3303 requires that the employing agency notify the officer to be interrogated of the identity of the interrogating officers (§ 3303, subd. (b)), and of 'the nature of the investigation prior to any interrogation' (§ 3303, subd. (c)). It also prohibits abusive interrogation techniques. (§ 3303, subds. (a) [interrogation to be conducted at a reasonable hour], (b) [no more than two interrogators], (d) [length of the interrogation session not to be unreasonable; subject must be allowed to attend to physical necessities], and (e) [no abusive language, promises or threats].) If the interrogation focuses on matters likely to result in punitive action against the peace officer, section 3303 allows the officer to

designate a representative to be present at the interrogation, provided that the representative is not someone subject to the same investigation. (§ 3303, subd. (h).)" (*Pasadena Police Officers Assn., supra*, 51 Cal.3d at p. 574.)

*Punitive Action*

The City's sole theory at summary judgment was that the Act does not apply because both officers were exonerated by the board of rights. The City argued that "an exoneration and reinstatement by a Board of Rights nullifies any punitive action leading to the Board of Rights such that the punitive action is deemed to not have been taken."

■ The question is one of statutory interpretation. Our review is de novo (*Shafer v. Los Angeles County Sheriff's Dept.* (2003) 106 Cal.App.4th 1388, 1396 [131 Cal.Rptr.2d 670]) and uncomplicated. To determine the meaning of a statute, we look first to the words of the statute (*Pasadena Police Officers Assn. v. City of Pasadena, supra*, 51 Cal.3d at p. 575) and in this case, we need look no further. ■ Section 3303 provides that it applies to an investigation or interrogation "that *could* lead to punitive action." (Italics added.) "Punitive action" itself is defined in section 3303, and the definition is in accord with the rest of the statute. It is "any action that *may* lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment." (§ 3303, italics added.)

These definitions mean that the City cannot prevail on its nullification theory, for under that theory, the Act's procedural rights would apply only if the investigation, once concluded, *has led to* punishment.

■ The Act "does *not* require a showing that an adverse employment consequence has occurred or is likely to occur." (*Otto v. Los Angeles Unified School Dist.* (2001) 89 Cal.App.4th 985, 997 [107 Cal.Rptr.2d 664].) Rather, "punitive action . . . may exist when action is taken which *may* lead to the adverse consequences . . . at some *future time*." (*Id.* at p. 996.)

The City's reliance on *Benach v. County of Los Angeles, supra*, 149 Cal.App.4th 836 does not assist it. In that case, a sheriff's deputy's suit under the Act depended on his contention that his involuntary transfer from a specified division was a punitive action. The court noted that the transfer did not involve loss of pay or rank and that it was not intended to punish, and found that it was not a punitive action for purposes of the statute. (149 Cal.App.4th at p. 845.) *Benach* did not consider an investigation, exoneration, or reinstatement, or any issue concerning nullification of a punitive action. It does not support the City's argument.

Under the City's theory, it could choose to violate the Act if it was confident that it would not ultimately prevail in its attempt to impose discipline, an absurd result. Moreover, the Act is to the contrary. It provides that "It shall be unlawful for any public safety department to deny or refuse to any public safety officer the rights and protections guaranteed to him or her by this chapter." (§ 3309.5, subd. (a).)

■ Application of the Act is determined at the beginning of the action, not after its end. In this case, it is easy to determine that the sick check might have led to punitive action, because it did lead to punitive action. The City was not entitled to summary adjudication or judgment on this cause of action on this theory.

*"Sick Check"*

Under section 3303, subdivision (i), section 3303 "shall not apply to any interrogation of a public safety officer in the normal course of duty, counseling, instruction, or informal verbal admonishment by, or other routine or unplanned contact with, a supervisor or any other public safety officer . . . ." In its brief on appeal, the City raises an argument under that subdivision, contending that Legaspi was conducting a routine sick check and asked only "innocent preliminary or casual questions" (*City of Los Angeles v. Superior Court, supra,* 57 Cal.App.4th at p. 1514) so that the Act did not apply.

■ The first problem with the argument is that was not a basis for the City's motion and, contrary to the City's argument, was not the basis for a trial court ruling. "It is a firmly entrenched principle of appellate practice that litigants must adhere to the theory on which a case was tried. Stated otherwise, a litigant may not change his or her position on appeal and assert a new theory. To permit this change in strategy would be unfair to the trial court and the opposing litigant. [Citations.]" (*Brown v. Boren, supra,* 74 Cal.App.4th at p. 1316.)

Of course, we have discretion to consider a new theory on appeal when it is purely a matter of applying the law to undisputed facts. (*Brown v. Boren, supra,* 74 Cal.App.4th at p. 1316.) The City argues that if we were to do so here, it would prevail. We consider the argument and reach the opposite conclusion.

■ The LAPD manual proffered by appellants indicates that there are different kinds of "sick checks," with different functions. Where a "sick check" is an investigation of abuse of sick leave, section 3303 applies. Here, the City did not establish, on undisputed facts, that the incident was "interrogation of a public safety officer in the normal course of duty, counseling, instruction, or informal verbal admonishment by, or other routine . . . contact" so that the Act does not apply. (§ 3303, subd. (i).) Instead, facts proffered by appellants suggest the opposite.

*Steinert v. City of Covina* (2006) 146 Cal.App.4th 458 [53 Cal.Rptr.3d 1] and *City of Los Angeles v. Superior Court, supra*, 57 Cal.App.4th 1506, cited by the City, are instructive. In *Steinert*, the Covina Police Department believed that Officer Steinert made a small mistake ("user error") while conducting a legitimate records search. That is, although the search was conducted when taking a vandalism report, Steinert did not input the crime report number, but designated the search as a training search. Steinert's supervising officer, Curley, spoke to her about this mistake and told her how the search should have been designated. He then asked one more question: whether she had disclosed any of the criminal history information to the victim of the vandalism. Steinert said that she had not.

Crime report audits were part of Curley's job: he would audit two reports a week by contacting the person who reported the crime and asking whether the officer had responded courteously and appropriately. Because he had already reviewed Steinert's vandalism report, he used that report for one of his weekly audits. During the audit, the victim reported that Steinert had disclosed information from the records search. An internal investigation was launched, and Steinert was ultimately dismissed.

Steinert sued for violation of the Act, contending that it applied to her conversation with Curley. The trial court found that the conversation was a routine communication between supervisor and officer, and the Court of Appeal found substantial evidence for the ruling. The conversation came about not because Steinert was suspected of wrongdoing, but because her supervisors believed that she had made a common mistake in the way she designated an entirely proper search. The purpose of the conversation was training, and nothing more. The Act did not apply.

*City of Los Angeles* considered very different facts. There, supervising officers heard a citizen report that a male Filipino officer in a city car had driven past the site of a traffic accident, and gone to a doughnut shop, without stopping to render assistance, a serious offense. The supervising officers checked the duty log and questioned the owner of the doughnut shop, and learned that Officer Labio was the only male Filipino officer on duty that

night, that a male Filipino officer had been to the doughnut shop, and that Labio did not have permission to use a city vehicle that night. Labio was then called in and questioned about his whereabouts that night and his use of the city car.

Labio was terminated from his position, based on allegations that he used a city vehicle without authorization, failed to stop at the scene of an accident, made an unauthorized detour to a doughnut shop, made false and misleading statements related to his actions to his supervising officer, and on other grounds. (*City of Los Angeles v. Superior Court, supra*, 57 Cal.App.4th at p. 1511.) He sued, claiming that the Act applied to the questioning. The trial court and the Court of Appeal agreed. The Court of Appeal held that "the second paragraph of section 3303, subdivision (i) is intended to cover innocent preliminary or casual questions and remarks between a supervisor and officer. It was included to avoid claims that almost any communication is elevated to an 'investigation.' The subdivision excludes routine communication within the normal course of administering the department. There probably are cases in which routine questions and remarks begin to shade into an investigation to which subdivision (i) does not apply. We need not decide just where that point is reached because it is clear that under our test an investigation was underway in this case." (57 Cal.App.4th at p. 1514.)

The facts here are much more like *City of Los Angeles* than they are like *Steinert*. Garvin suspected wrongdoing, and sent Legaspi to investigate. Legaspi's first statements to Garvin ("Guess what . . . he's not home. . . . I have it all on tape . . . .") are not the kind of statements which are made about a routine communication, a training session, or a call "to see whether an officer is okay." The statements say that Garvin and Legaspi set out to confirm a suspicion, indeed, to catch R. Paterson in a lie. That is precisely the kind of conduct to which the Act applies.

We cannot agree with the City that on these facts, only innocent or preliminary questions took place, and that Legaspi stopped her questioning as soon as she thought a serious offense, a false statement to a supervising officer, had taken place.

Notably, *City of Los Angeles* rejected the city's argument that the Act applies only to investigations conducted by internal affairs units, an argument similar to the one the City makes here. *City of Los Angeles* found that "the City's position is contrary to the legislative purpose of the Act to protect police officers from abuse or arbitrary treatment. [Citation.] If an officer under investigation for a violation of law or department rules could be interrogated by his commanding officer outside the procedural protections of the Act, the protections afforded to police officers in the Act would be

eviscerated." (*City of Los Angeles v. Superior Court, supra*, 57 Cal.App.4th at p. 1515.) We echo the sentiment. If we were to allow the kind of questioning which the facts before us demonstrate, and hold the procedural protections of the Act only applied after Legaspi obtained what she considered to be false statements, we would eviscerate the Act.

There is an additional problem with the City's argument on this point: though the City argues that Legaspi ceased her questioning as soon as the conversation "shaded into" an investigation, the City did not propose facts on the question, and we can have no idea whether there is a triable issue of fact on when Legaspi's questioning ended.

Finally, we see no merit in the City's argument that the Act applied to the questioning in *City of Los Angeles* because that questioning was based on fact, but did not apply here because Garvin acted on suspicion and did not check the facts. According to Garvin's testimony before the board of rights, R. Paterson's records showed that he was not a frequent user of sick time, but the fact that Garvin neglected to check the records before he sent Legaspi to the Paterson home cannot be determinative.

### The Tort Causes of Action: Immunity[5]

Under section 821.6, "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." Under section 815.2, subdivision (b), "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

■  "The policy behind section 821.6 is to encourage fearless performance of official duties. [Citations.] State officers and employees are encouraged to investigate and prosecute matters within their purview without fear of reprisal from the person or entity harmed thereby. Protection is provided even when official action is taken maliciously and without probable cause." (*Shoemaker v. Myers* (1992) 2 Cal.App.4th 1407, 1424 [4 Cal.Rptr.2d 203]

---

[5] Appellants contend that this defense was waived because it was not sufficiently asserted in the answer. Governmental immunity is a jurisdictional question (*Kemmerer v. County of Fresno* (1988) 200 Cal.App.3d 1426, 1435 [246 Cal.Rptr. 609]), and thus is not subject to the rule that failure to raise a defense by demurrer or answer waives that defense. (Code Civ. Proc., § 430.80, subd. (a).) At any rate "It is a plaintiff's responsibility to plead ' "facts sufficient to show [his or her] cause of action lies outside the breadth of any applicable statutory immunity." ' " (*Gates v. Superior Court* (1995) 32 Cal.App.4th 481, 494 [38 Cal.Rptr.2d 489].)

[immunity applies to claim of wrongful termination in violation of public policy, based on allegation that plaintiff was fired for exercising his rights under the Act].)

Appellants' argument to the contrary is that Legaspi's (and thus the City's) liability does not flow from the institution of judicial or administrative proceedings, but from her improper investigation and interrogation of them, in violation of the Act.

■ However, section 821.6 extends to actions taken in preparation for formal proceedings, including investigation, which is an "essential step" toward the institution of formal proceedings. (*Javor v. Taggart* (2002) 98 Cal.App.4th 795, 808 [120 Cal.Rptr.2d 174].)

Having decided that Legaspi and the City were immune from liability on these causes of action, we need not consider the alternative ground on which summary adjudication was granted, the bar of the Workers' Compensation Act.

## Disposition

The judgment is reversed and the matter is remanded to the trial court with instructions to grant summary adjudication on the tort causes of action in favor of the City and Legaspi and to conduct further proceedings consistent with this opinion. Appellants are to recover costs on appeal.

Kriegler, J., concurred.

**MOSK, J.,** Concurring.—I concur.

The question of whether a "sick check" or question asked constituted an investigation or interrogation subject to the protections of Government Code section 3303 was not a ground upon which the summary judgment motion was made or the summary judgment was rendered. On appeal, the City of Los Angeles seems to suggest that a sick check automatically falls under the exemption provided for in Government Code section 3303, subdivision (i) (Gov. Code, § 3303 rights do "not apply to any interrogation of a public safety officer in the normal course of duty . . . or other routine . . . contact with . . . any other public safety officer").

As the facts submitted by plaintiff show, this suggestion is not correct. But not every "sick check" qualifies as the type of investigation or interrogation that would make applicable the rights under Government Code section 3303. Whether there was a violation in this case, and, if so, what the appropriate remedy should be are matters to be determined by the trial court. (See *Gales v. Superior Court* (1996) 47 Cal.App.4th 1596, 1602 [55 Cal.Rptr.2d 460]; *DiPirro v. Bondo Corp.* (2007) 153 Cal.App.4th 150 [62 Cal.Rptr.3d 722].)