Filed 7/15/15  Patton v. City of Montclair CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| GHIA PATTON, | D067413 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. CIVRS1208056) |
| CITY OF MONTCLAIR, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of San Bernardino County, Gilbert G. Ochoa, Judge.  Affirmed.


Green & Shinee and Audra C. Call for Plaintiff and Appellant.

Law Offices of Samuel J. Wells and Samuel J. Wells, Jr., for Defendant and Respondent.

The City of Montclair (city) terminated Ghia Patton (Patton) from the Montclair Police Department (department) after an internal investigation revealed Patton had been dishonest on two separate occasions with respect to certain events that occurred on April

27, 2009, when she left work at 10:30 a.m. for an eye doctor's appointment and did not return to work after the appointment. The court subsequently denied Patton's petition for writ of mandate (petition). Because substantial evidence in the record supports the court's findings and decision, we affirm the order denying the petition and the judgment thereon.

PROCEDURAL OVERVIEW

The department hired Patton as a police officer in April 2006. After Patton was terminated in February 2010, she appealed and the matter went to nonbinding arbitration. The hearing officer in his April 2012 advisory opinion recommended the city reinstate Patton.

Pursuant to the memorandum of understanding (MOU) between the department and the Montclair Police Officers' Association, the city appealed the arbitrator's advisory opinion to the city council. After considering the entire record of proceedings before the hearing officer, the parties' written briefs and hearing the oral argument of counsel, the city council exercised its independent authority as was its right under the MOU and unanimously granted the city's appeal, rejected the proposed findings and decision of the hearing officer, and upheld the termination of Patton.

As relevant here, Patton contended in her petition that the city failed to proceed in the manner prescribed by the Public Safety Officers Procedural Bill of Rights Act (the act; Gov. Code, § 3300 et seq.); that the weight of the evidence in the administrative record did not support the finding(s) of the city council that she engaged in misconduct warranting disciplinary action; and that her punishment was, in any event, excessive.

2

After hearing oral argument of counsel, the court denied the petition on all grounds. In so doing, the court found that there was no violation of the act "by reason of the questioning of Patton on April 28, 2009," the day after her appointment; that the weight of the evidence supported the city's findings and decision; and that Patton's termination was not excessive as a matter of law "because a police officer's dishonesty about the circumstances surrounding time off from duty is conduct such as to cause harm to the public service and as such supports the penalty of termination."

FACTUAL OVERVIEW

In early April 2009, Patton sustained an injury to her right eye while on duty. As a result, Patton was placed on modified or "light" duty and assigned to records under the supervision of Records Supervisor Susan Hackley, a nonsworn employee of the city.

On the morning of April 27, 2009, while still assigned to modified duty, Patton told Hackley that she would be leaving at 10:30 a.m. for a follow-up 11:15 a.m. eye appointment. Hackley assumed that Patton had filled out the necessary paperwork for, and had advised one or more of Patton's other supervisors of, the eye appointment. Patton left for her appointment and neither returned to work that day nor called to inform Hackley nor anyone else in the department that she would not be returning after the appointment.

The administrative record shows Patton went to the eye doctor. Although her pupils were not dilated as before, some drops were put in her eyes. The doctor released Patton to return to work that same day. Patton left the doctor's office before 1:00 p.m., more than four hours before the end of her shift. Hackley believed Patton would update

3

her after the appointment regarding whether Patton's pupils were "dilated" and whether she intended to return to work.

Toward the end of the day, Hackley informed Lieutenant Stephen Lux and Deputy Chief Christopher Weiske that Patton had not returned to work after the appointment. During a conversation that Lux estimated lasted "about a minute," Hackley also informed Lux that she was frustrated by Patton's overall performance in records, including by the fact that Patton had left a "bunch of staples" on the floor. According to Lux, during this short conversation Hackley was neither angry nor suggested any action be taken against Patton.

Early the next morning, Lux was having coffee with other officers when Patton arrived at work and headed towards records. Lux called out to Patton and said, in a "lighthearted tone," as if he was asking someone about their weekend, "'Hey, where were you yesterday?'" According to Lux, Patton responded that she had told Hackley where she was going, or words to that effect, and that if there was "'a problem[,] someone should have called [her].'" Lux in response said, "'No problem.'"

Later that morning at the department's weekly staff meeting, Hackley reiterated her frustration with Patton's work performance. Hackley mentioned during the staff meeting that at times she did not know where Patton was and that she would find Patton "in debriefing, either doing a report or correcting something." After Lux concluded there was a "breakdown in communication" regarding Patton's job assignment while on modified duty, Chief Keith Jones directed Lux and Weiske to speak to Patton "and clarify what . . . the expectations were for her . . . in records."

4

According to Lux, there was no mention during the staff meeting that Patton should be disciplined or that she otherwise was in violation of some department policy. Instead, Lux noted he and Weiske were going to meet with Patton merely to make sure "everyone was on the same page" regarding her responsibilities while she was assigned to modified duty.

Later that morning, Lux and Weiske met with Patton. Lux reported he asked Patton words to the effect of "'[W]hat happened yesterday afternoon?'" and "'[W]hy didn't you come back to work?'" Lux asked these questions because he wanted to "clarify" Patton's responsibilities in records. Lux intended the conversation to be "low key."

According to Lux, Patton told them that before she left for her 11:15 a.m. eye appointment, she told Hackley that if her pupils were "dilated," she would not be returning to work. Lux and Weiske both reported that Patton specifically used the word "dilated" during their conversation. Patton also told them that the doctor did not dilate her pupils; that her eye appointment "took three hours [or] a little more than that"; that she did not leave the doctor's office until after 2:00 p.m.; that although her pupils had not been dilated, some "yellow dye" had been put in her eyes; and that after the appointment, she immediately went to get her prescription filled.

Lux further reported that Patton told them that sometime after 3:00 p.m., she went "home" and washed the yellow dye from her eyes. Lux noted Patton went into great detail regarding the steps she took to remove the dye from her eyes, which Lux further noted "took [Patton] some period of time." Because it was then about 4:30 p.m., Lux reported Patton told them she decided not to return to work, although she acknowledged

5

she was not excused from doing so by the doctor. Lux further reported Patton told them she believed it was unnecessary to inform Hackley that she would not be returning after her appointment because of their conversation before she left.

During what Weiske described as a "summary or a running narrative," Weiske reported that Patton told them about her previous eye appointments, which she said usually took between two and a half to three hours. According to Weiske, in one of those appointments the doctor had dilated Patton's pupils and, as a result, Patton had called the department because she could not drive. Lux reported that he recalled this incident and noted the department in response had sent cadets to pick up Patton and drive her home. In regards to the eye appointment a day earlier, Lux reported Patton said that a friend took her to the eye appointment and that if her pupils were "dilated," her friend would take her home afterwards. According to Lux, Patton did not then mention she felt sick or nauseous after the appointment.

At the end of their conversation, Lux told Patton not to "'let that happen again'" and informed her of the need to "'communicate better'" with Hackley." Lux also told Patton to make sure she was at work by 7:00 a.m. and to inform Hackley if she was going to leave records.

Weiske reported that during the meeting, he told Patton that the department would be willing to pay her until 2:30 p.m., about when her eye appointment ended, but not from 2:30 to 5:30 p.m., when her shift ended. Weiske told Patton she likely would need to use her "own time" for the three hours she missed, which, according to Weiske, Patton agreed was "'not a problem.'"

6

During the meeting, Weiske asked Patton if the doctor had discussed when she might be able to return to duty. According to Weiske, the department had been filling her position on a "day-to-day basis" and the doctor's note from the April 27 consult was "totally unclear" when Patton would be able to return to regular duty. Weiske reported Patton in response stated the eye doctor wanted her to consult with a cornea specialist because her eye was not healing properly, and, as such, she likely would be off work about two more weeks. According to Lux, they wished Patton well just before the meeting concluded.

After the meeting, which Weiske estimated lasted about 15 or 20 minutes, Lux and Weiske discussed the need for a "reiteration memo" in order to memorialize their conversation with Patton and the department's expectations of her. According to Weiske, a reiteration memo was not used by the department to support an officer's discipline.

Weiske next told Lux he would contact Gary Charleston, the department's personnel officer, "'to see if he can get a[]hold of the doctor and try and get us, from the doctor, a better prognosis about how much longer [Patton] was going to be off work.'" Weiske in fact contacted Charleston after the meeting with Patton because, according to Weiske, the department needed to "start making some decisions about scheduling and who we were going to move to her shift because we had to cover her spot." Weiske also asked Charleston to ask the doctor if Patton's eye appointments would continue to take about three hours.

Later that day, Charleston informed Weiske that he had spoken to the doctor's office; that the doctor was attempting to get a referral for Patton to see a corneal

7

specialist, as Patton earlier reported; and that Patton's eye appointments did not take three hours but rather typically lasted about an hour to an hour and a half "max." Charleston also informed Weiske that the day before, Patton arrived on time for her 11:15 a.m. eye appointment and that the doctor's office's computer showed Patton received a prescription at 12:29 or 12:30 p.m., which, according to a member of the doctor's staff, as subsequently confirmed by the doctor himself, was typically given to a patient just before his or her appointment ended. Weiske in response instructed Charleston to call back the doctor's office and find out if Patton was in the office through lunch, until about 2:15 p.m., as she had represented.

Charleston subsequently informed Weiske that, although the eye doctor did not lock his office when it closed for lunch between 1:00 and 2:00 p.m., according to staff there would have been no reason for Patton to remain in the office during the lunch hour. As a result, Weiske became suspicious that Patton may have "untruthful" when she spoke with him and Lux. Weiske next instructed Charleston to speak to administrators of Patton's workers' compensation claim regarding Patton's prescription, including whether it was filled and, if so, when.

Weiske subsequently learned from Charleston that the workers' compensation records showed Patton had filled her prescription at a pharmacy in Alta Loma, near her home, a little before 9:00 p.m. on the day of her appointment. Because Patton had told Lux and Weiske that she went to the pharmacy immediately after she left her eye appointment, at or about 2:15 p.m., Weiske concluded there was a "direct conflict"

8

between what Patton told them during their meeting and what the records showed she actually had done.

Weiske informed Jones of his findings and recommended the department conduct an "administrative investigation into possible misconduct" by Patton. A few days later, when Patton returned to work after taking her normal days off, Weiske placed Patton on administrative leave, advised her of the pending administrative investigation into possible misconduct involving "the scenario of events" with respect to her doctor's appointment on April 27, and suspended her peace officer powers.

Patton was interviewed in June 2009 as part of the department's administrative investigation into her potential misconduct. The interview was conducted by Lieutenant Michael deMoet, among others. Also present at the interview was Patton's representative. The interview was recorded and transcribed.

The administrative record shows that after being read the city's "[a]dmonition of [r]ights," which included the rights under the act, Patton stated that before she left for her eye appointment on April 27, she told Hackley that if the doctor "mess[ed] with [her] eyes, putting drops in [her] eyes, [she] would not be coming back" because she would not "feel well enough to come back."[1] Patton stated she left work at around 10:30 a.m., went to Alta Loma and met a friend who drove her to the eye appointment.

---

[1] The administrative record shows this statement by Patton was in direct conflict with Hackley's recollection of their conversation in which Patton told Hackley that she would not be returning to work after the appointment if the eye doctor "dilated" her pupils. As noted *ante*, both Lux and Weiske also reported that Patton used the word

9

Patton told the investigators that she waited about an hour in the waiting room before she was taken into the exam area; that she next was given some tests that lasted about 15 or 20 minutes; and that she then waited another 15 or 20 minutes in an examination room until she was seen by the doctor. Patton estimated she then spent another 25 or 30 minutes with the doctor. During the appointment, Patton said drops were twice placed in her eyes, once by the doctor's assistant and another time by the doctor himself. Patton said the drops stung, made her nauseous and gave her a headache that lasted for hours.

Patton told investigators that after her appointment ended, she waited another five or 10 minutes in the reception area to make her next appointment and for a printout of her prescription. Patton said that she left the doctor's office between 1:00 and 1:15 p.m. Patton admitted she did not ask to use the restroom in the doctor's office to flush out her eyes, despite the fact they hurt from the eye drops.

Because Patton did not feel well and had not eaten, she told investigators she and her friend decided to stop at a restaurant in Rancho Cucamonga before they headed to her home in Alta Loma. According to Patton, she did not eat much because she still did not feel well. After lunch, she decided not to go back to work but instead to go to her friend's house, where she fell asleep. Patton estimated she arrived at her friend's house between 2:10 and 2:15 p.m. Once at her friend's house, Patton flushed out her eyes. Patton stated

"dilated" when they informally questioned her on the morning of April 28 about the appointment.

10

she could not think of any reason why she did not use the restroom in the restaurant to flush out her eyes, despite the fact they were then still bothering her.

Patton told investigators she slept at her friend's house for about two hours. Upon awakening, Patton still felt sick. She spoke with her brother, who invited her to dinner. Patton and her friend went to her brother's house for dinner around 6:00 p.m. After dinner, Patton's friend drove her home, where she arrived sometime after 8:00 p.m. Patton then drove to the pharmacy and picked up her prescription.

Patton told investigators she had called the pharmacy right after the doctor's appointment to make sure the pharmacy had her medication. Patton noted that "for some reason or [an]other, [her] phone bill show[ed] four o'clock" with respect to when she made that call. In any event, an employee of the pharmacy told Patton the pharmacy had the medication but needed the written prescription to fill it.

In response to why she did not call her supervisors after her eye appointment to inform them she would not be returning to work, Patton told investigators she felt that issue had been covered when she spoke with Hackley before the appointment. Patton thus concluded it was unnecessary to call a second time.

Patton told investigators she arrived at work at 7:00 a.m. on April 28 (i.e., the day after her appointment). Shortly after arriving, Patton spoke to Lux. She described it as a "pass-by type of good morning conversation" that lasted about a minute. According to Patton, Lux asked about the day before, which surprised Patton because she told investigators that prior to leaving work she *also* had informed Lux about the appointment. However, the record shows Patton could not recall the exact time she had spoken to Lux

11

about the appointment, where they had spoken or what was said, other than her informing Lux, "'Hey, just letting you know I have my doctor's appointment' kind of conversation."

Patton told investigators that in response to Lux's question, she told them that if anyone wondered where she had been the day before or was otherwise worried about her, they could have called her cell phone. According to Patton, Lux responded, "'Oh, everything's fine. Don't worry about it' kind of thing, and that was it."

Patton reported she was busy working in records later that same morning when she was summoned to Lux's office for a meeting. Weiske also attended the meeting. Patton told investigators that Lux began the meeting by saying she was not "'in trouble'" and to "'relax.'" Lux then asked Patton, "'What's going on?'" Patton reported she initially did not understand what Lux was even referring to until he clarified he was asking why she had not returned to work after her doctor's appointment the day before.

Patton told investigators that in response to Lux's question, she reiterated what she had told Lux earlier that morning; namely, that she did not come back to work because she was not feeling well. Patton reported that she also had told Hackley before she left for the appointment that if the doctor put "something" in her eyes, she would not be back to work that day.[2]

According to Patton, Lux started asking her a series of questions that "stunned" her. Patton told investigators that the tone of Lux's voice made her uncomfortable and that, at times, Weiske interjected and acted as mediator. When asked by investigators

---

2    See footnote 1, *ante*.

what those questions were, Patton said she could only recall the "gist" of them.  Patton reported Lux accused her of "wrongdoing with regards to [her] two weeks of light duty" because he believed she should have returned to duty a week earlier.

Although Patton was nauseous and had a headache after the eye appointment, she told investigators she did not get into specifics with Lux and Weiske regarding the reasons she did not return to work, other than telling them about the need to fill her prescription and flush her eyes.

Patton told investigators that toward the end of their meeting, she agreed to take "personal time or sick time" as a result of her missing work the day before.  According to Patton, Weiske said that he would check to see if that was even necessary; that there were a lot of people depending on her; and that her being on light duty was an imposition to the department.  According to Patton, the next day Weiske informed her she would in fact have to use her "own time" after Weiske conferred with workers' compensation and determined the doctor had not excused her from returning to work after the appointment.

As a result of the administrative investigation, in January 2010 Jones recommended that Patton be terminated for her violation of the city's Department Rules and Regulations (rules), including as relevant in this appeal rule 4.1.01 (General Obedience);[3] rule 4.3.01 (General Conduct);[4] and rule 4.3.06 (Personal Integrity).[5]

---

[3]    Rule 4.1.01 provides:  "Members of the Department . . . shall respect and obey all laws, ordinances, and Department regulations."

[4]    Rule 4.3.01 provides:  "Members . . . shall not be guilty of misconduct, neglect of duty, conduct unbecoming to a member or acts bringing discredit to the Department, even

13

Jones determined that Patton was "dishonest during [her] conversation with Lieutenant Lux and Deputy Chief Weiske on April 28, 2009, in regards to [her] actions surrounding [her] doctor's appointment on April 27, 2009"; that "[she was] dishonest with [department] investigators when [she was] questioned [in June 2009] about the circumstances surrounding the allegations of providing false information to Lieutenant Lux and Deputy Chief Weiske"; and that "without reference to statements [she] made to Lieutenant Lux and Deputy Chief Weiske, . . . [she was] dishonest with [department] investigators when [she was] questioned about the circumstances surrounding [her] doctor's appointment on April 27, 2009." Jones determined that each of these findings "separately and distinctly" violated the rules and supported Patton's termination.

As noted, Patton appealed the department's determination. After an evidentiary hearing, the hearing officer found Patton "simply misjudged time and, at worst, committed only a minor violation of [the department's] rules which could result in no more than a written warning." As also noted, the city appealed to the city council the hearing officer's advisory findings and opinion, as was its right under the MOU.

After hearing argument of the parties and considering the "entire record" of the proceedings before, and the advisory opinion issued by, the hearing officer, the city council unanimously rejected the proposed findings and decision of the hearing officer

though such conduct is not specifically set forth in these rules or any other act outlined under the disciplinary section of the existing MOU's."

5      Finally, rule 4.3.06 provides: "Members shall not depart from the truth, either in giving testimony or in connection with any of their official duties. Members shall not be guilty of oppression, favoritism, willful wrongs or injustice."

14

and upheld Patton's termination. Briefly, in its 17-page decision the city council found the hearing officer "failed to consider the evidence in an objective manner, made statements and findings contrary to the evidence in the record, and drew conclusions not based on evidence presented."

The city council also found Patton knowingly lied. In making this finding, the city council reviewed in detail the actual events of April 27 when Patton went to her doctor's appointment and did not return to work, on the one hand, and Patton's statements regarding the April 27 appointment that she made to Lux and Weiske during their informal April 28 meeting and to investigators during the June 2009 department investigation into potential misconduct, on the other hand.

As a result of these statements, the city council found Patton "was dishonest during her conversation with Lt. Lux and Dep. Chief Weiske on April 28, 2009, in regard to her actions surrounding her doctor's appointment on April 27, 2009"; and that she "was dishonest with [department] investigators when she was questioned about the circumstances surrounding the allegations of providing information to Lt. Lux and Dep. Chief Weiske." Because "honesty and truthfulness" were essential character traits in a police officer, "whose credibility is in issue in any criminal prosecution," the city council upheld Patton's termination.

15

DISCUSSION

A.  Governing Law and Standard of Review in Administrative Mandamus

This is an action for administrative mandamus under Code of Civil Procedure[6] section 1094.5.  This statute provides in part: "(a) Where the writ is issued for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer, the case shall be heard by the court sitting without a jury. . . .  [¶]  (b) The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.  Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.  [¶]  (c) Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence."  (§ 1094.5)

Subdivision (c) of section 1094.5 provides that when the petitioner claims the administrative agency's findings are not supported by the evidence, as Patton does in the instant case, the trial court's review of an adjudicatory administrative decision depends on

6    All further statutory references are to the Code of Civil Procedure unless otherwise noted.

16

the nature of the right involved. (See *Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 313.) "If the administrative decision substantially affects a fundamental vested right, the trial court must exercise its independent judgment on the evidence." (*Ibid.*, citing *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32.)

In such instances, the trial court must exercise its independent judgment "upon the weight of the evidence produced or which could not, in the exercise of reasonable diligence, have been produced before the administrative agency and any evidence which might have been improperly excluded by the administrative agency." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143, fn. 10; see also *SP Star Enterprises, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 459, 469 ["If the administrative decision involved or substantially affected a 'fundamental vested right,' the superior court exercises its independent judgment upon the evidence disclosed in a limited trial de novo in which the court must examine the administrative record for errors of law and exercise its independent judgment upon the evidence"].) This review by the trial court requires it to reweigh the evidence and make its own determination of the credibility of the witnesses. (*Barber v. Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652, 658.)

In applying "independent judgment," a trial court nonetheless "must accord a '"strong presumption of . . . correctness"' to administrative findings" (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 816-817), and the burden rests on the "complaining party to show that the administrative '"decision is contrary to the weight of the evidence."' [Citations.]" (*Id.* at p. 817.)

Here, the parties agree that the city council's decision substantially affects a fundamental vested right, namely, Patton's interest in continued employment with the department. (See *Civil Service Com. v. Velez* (1993) 14 Cal.App.4th 115, 121.) Thus, the trial court properly applied the independent judgment standard of review to the administrative record. (See *Wences v. City of Los Angeles*, *supra*, 177 Cal.App.4th at p. 313.)

"Regardless of the nature of the right involved or the standard of judicial review applied in the trial court, an appellate court reviewing the superior court's administrative mandamus decision always applies a substantial evidence standard." (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1058.) When, as here, a fundamental vested right is involved and the trial court therefore exercised independent judgment, "it is the trial court's judgment that is the subject of appellate court review," and the appellate court reviews the record to determine whether substantial evidence supports the judgment. (*Ibid.*)

"An appellate court must sustain the trial court's factual findings if substantial evidence supports them, resolving all conflicts in favor of the prevailing party, and giving that party the benefit of every reasonable inference in support of the judgment." (*Flippin v. Los Angeles City Bd. of Civil Service Commissioners* (2007) 148 Cal.App.4th 272, 279; *Fukuda v. City of Angels*, *supra*, 20 Cal.4th at p. 824 [noting that, "[e]ven when, as here, the trial court is required to review an administrative decision under the independent judgment standard of review, the standard of review on appeal of the trial court's determination is the substantial evidence test"].)

18

The record shows the city submitted an eight-page proposed order that included detailed factual findings and legal conclusions. Patton opposed the proposed order, including on the basis that neither party had requested the court to prepare a statement of decision (see § 632) and that the city's proposed order was, in any event, late. (See *ibid.*) The record shows the court did not sign the city's proposed order and instead signed a short yet concise order denying the petition, as discussed *ante.*

Because the court did not sign the city's proposed order and because neither party requested the court to issue a statement of decision explaining the factual and legal basis for its decision (see *Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 67 [noting that section 632 applies to administrative mandamus proceedings]), we presume the court made all factual findings necessary to support its judgment and review the record solely to determine whether substantial evidence supports those findings, implied or otherwise. (§ 634; *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59-60.) When the parties waive a statement of decision in an administrative mandamus proceeding, "'[i]t must be conclusively presumed . . . that the trial court weighed the evidence giving due weight to the presumption in favor of the . . . findings,'" and we must affirm the lower court's decision if it is supported by substantial evidence in the record. (*Fukuda v. City of Angels*, *supra*, 20 Cal.4th at p. 812, italics omitted, quoting *Drummey v. State Board of Funeral Directors & Embalmers* (1939) 13 Cal.2d 75, 86.)

Moreover, when the issue on review concerns the nature or degree of an administrative penalty, the appellate court reviews the penalty to determine whether the agency abused its discretion. (*California Real Estate Loans, Inc. v. Wallace* (1993) 18

19

Cal.App.4th 1575, 1580.) "[N]either a trial court nor an appellate court is free to substitute its discretion for that of an administrative agency concerning the degree of punishment imposed." (*Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 204.)

B. The Act

1. *Brief Additional Background*

As noted, Patton's primary contention on appeal is that the city violated her rights under the act, specifically Government Code section 3303, when Lux and Weiske questioned her on April 28 about the events of the day before, when she left work at 10:30 a.m. for an 11:15 a.m. eye appointment and did not return to work until the following day. In connection with her petition, the court found the weight of the evidence in the administrative record supported the findings and decision of the city council, including the finding there was no violation of the act.

Specifically, the city council found that "[w]hat ultimately led to the discipline [of Patton] was not the matter about which Officer Patton was questioned, but rather the fact that as part of routine communications between supervisors and subordinates, she was dishonest, and the dishonesty was only discovered following the discussions. It is undisputed that there is no evidence that there was any discussion on April 28, 2009 of possible discipline. It is further undisputed that neither Lt. Lux nor Dep. Chief Weiske had any expectation or ever thought that their discussion with Officer Patton might lead to discipline. The purpose of the meeting was merely to clarify with Officer Patton the

20

Department's expectations and what her reporting responsibilities were while on modified duty."

2. *Guiding Principles*

The act provides in part: "When any public safety officer is under investigation and subjected to interrogation by his or her commanding officer, or any other member of the employing public safety department, that could lead to punitive action, the interrogation shall be conducted under [certain] conditions" or with certain procedural safeguards. (Gov. Code, § 3303.) Such procedural safeguards include the right to be informed of the nature of the investigation before being subjected to interrogation (*id.*, subd. (c)); the right to be represented at the interrogation by a representative of the officer's choice (*id.*, subd. (i)); and the right to bring a recording device and record the interrogation (*id.*, subd. (g)). We note the act does not define the terms "investigation" or "interrogation."

The act, and specifically Government Code section 3303, does not, however, apply to "any interrogation of a public safety officer in the normal course of duty, counseling, instruction, or informal verbal admonishment by, or other routine or unplanned contact with, a supervisor or any other public safety officer." (Gov. Code, § 3303, subd. (i).)

3. *Analysis*

A key issue in the instant appeal involves the nature of the April 28 meeting in which Patton was accused of lying to Lux and Weiske regarding her activities the day before, including what she told Hackley before she left for her doctor's appointment; how

21

long she was at the appointment; and where she went and when, after the appointment ended. If, as Patton contends, she was "under investigation and subjected to interrogation" that could lead to punitive action, then the act would apply and she was entitled to its procedural protections. If, as the city contends, the April 28 meeting was merely a routine interrogation in the normal course of duty, counseling, or informal verbal admonishment, then the act would not apply and there was no violation of her rights under the act.

We review for substantial evidence the court's implied finding (see *Fladeboe v. American Isuzu Motors Inc.*, *supra*, 150 Cal.App.4th at pp. 59-60) that the purpose of the April 28 meeting was merely to clarify the department's expectations of Patton while she was on light or modified duty, including her reporting responsibilities, and, thus, was an interrogation in the normal course of duty for purposes of subdivision (i) of Government Code section 3303.

As summarized in detail *ante*, the evidence in the record shows that the April 28 meeting was called after Hackley expressed frustration with Patton's work performance during the department's weekly staff meeting; that a day earlier, when Hackley was preparing to leave work, she mentioned to Lux and Weiske during a conversation that lasted "about a minute" that Patton had left a "bunch of staples" on the floor and that Patton had not returned to work following her eye appointment; and that in response, and because nobody in the department had yet discussed with Patton her responsibilities while on modified duty, Jones directed Lux and Weiske to speak with Patton to "clarify" the department's expectations of her while on such duty.

22

What's more, there was no mention during the routine weekly staff meeting that Patton did anything wrong, including violating any department policy, and/or that there was a need to investigate and/or punish Patton for any such alleged wrongdoing. This evidence, which is substantial, also supports the finding that the April 28 meeting was for the purpose of instructing and counseling Patton, to make sure everyone was "on the same page," and not for the purpose of investigating or interrogating her that in turn "could lead to punitive action." (Gov. Code, § 3303.)

Moreover, the record shows that Lux intended the meeting with Patton and Weiske to be "low key"; that Patton discussed her eye appointment in a "running narrative," in which *she* volunteered detailed information during the meeting, which lasted about 15 or 20 minutes, including her activities both before and after the appointment; and that at the end of the meeting, Lux told Patton she needed to "communicate better" with Hackley. Lux also outlined Patton's responsibilities while she was on modified duty, including her work schedule.

The record shows that after the meeting, Lux and Weiske decided they needed more information regarding when Patton could return to regular duty because the department had been filling her position on a "day-to-day basis." Weiske noted the eye doctor's note from Patton's April 27 consult was "totally unclear" when she could return to work and even Patton was somewhat unsure how much longer she would be on modified duty, given the doctor's statements that her eye was not healing properly and that she needed to consult with a cornea specialist.

There is no evidence in the record that the department contacted the doctor after the April 28 meeting because Lux and/or Weiske did not *then* believe Patton's story or otherwise were suspicious about the details she provided. In fact, the record shows the opposite: just before the meeting ended, they wished Patton well and told her they hoped she returned to duty *soon*.

In light of the foregoing and based on the totality of the circumstances then presented, including the fact that Patton filled out a leave request for three hours based on her statement she was at the eye doctor's office until about 2:30 p.m., we conclude there is ample evidence in the record to support the court's finding that what ultimately led to Patton's termination was not the matter about which she was questioned by Lux and Weiske during the short meeting on April 28, but rather the fact that as part of their routine questioning of her during that meeting she was dishonest, which dishonesty came to light only *after* the meeting. (See *Steinert v. City of Covina* (2006) 146 Cal.App.4th 458, 462 [applying a substantial evidence standard of review in finding abundant evidence supported the court's finding that a conversation between a police officer and the officer's superior was a routine communication and not an interrogation that could lead to punitive action when the superior questioned the officer about a records search in which the officer improperly designated the search as "'TRNG'" (i.e., training) and in upholding the termination of the officer because during that conversation the officer lied to the superior and said no confidential communication from that search had been disclosed to the victim]); cf. *City of Los Angeles v. Superior Court* (1997) 57 Cal.App.4th 1506, 1510, 1514 [upholding the finding that the exception in Gov. Code, § 3303, subd.

24

(i) did not apply because when the police officer was initially questioned his superiors were then *already* aware of alleged serious misconduct by the officer that was the subject of the questioning and that could lead to discipline]; and *Paterson v. City of Los Angeles* (2009) 174 Cal.App.4th 1393, 1396, 1403 [rejecting the defendant city's theory that a superior officer's questioning of plaintiff police officers, husband and wife, were routine communications under Gov. Code, § 3303, subd. (i) because when plaintiff husband made the false and misleading statements regarding his allegedly being sick at home, the superior officer was then at plaintiffs' home, was armed with a tape recorder and knew then husband was neither home nor sick].)  Thus, we conclude substantial evidence supports the finding that the act and its protections did not apply to the April 28 meeting between Lux, Weiske and Patton.  (See *Steinert v. City of Covina*, *supra*, at p. 465.)

That there is other evidence in the record—including the reiteration memorandum prepared by Lux—that *could* support one or more different or even conflicting findings, implied or otherwise, made by the court in the instant case does not change our conclusion.  (See *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 622 [noting the general rule that a court of review does not reweigh the evidence and make one or more new findings under a substantial evidence standard merely because there is conflicting evidence in the record that would have supported such findings]; see also *JKH Enterprises, Inc. v. Department of Industrial Relations*, *supra*, 142 Cal.App.4th at p. 1058.)

In any event, the record shows Lux began to draft the reiteration memorandum the *same* day he and Weiske met with Patton (i.e., April 28), although he did not complete it

25

until May 4, 2009, *after* the potential misconduct of Patton came to light. We thus conclude the reiteration memorandum does not preclude as a matter of law the finding that, when Lux and Weiske initially met with Patton in the morning of April 28, it was a matter of routine communication to clarify the department's expectations of her while she remained on modified duty. (See *City of Los Angeles v. Superior Court*, *supra*, 57 Cal.App.4th at p. 1514 [noting that Gov. Code, § 3303, subd. (i) is indicative of legislative intent to limit the application of § 3303 "to avoid claims that almost any communication is elevated to an 'investigation'"].)

Based on the evidence in the record, as summarized *ante*, we further conclude there is ample evidence to support the finding of the court that, at a minimum, Patton violated department rule 4.3.06, which, as noted *ante*, provides that a police officer "shall not depart from the truth, either in giving testimony or in connection with any of their official duties." The record supports the finding Patton was dishonest with Lux and Weiske during the April 28 meeting regarding her activities the day before, including with respect to what she told them (i.e., how long she was at the doctor's office; when she went to the pharmacy; and under what circumstances she would return to work following her appointment), on the one hand, and what she neglected to tell them (i.e., after the appointment she went to lunch with her friend; she slept at her friend's home and not at

her own home; and she and her friend went to her brother's house that evening for dinner), on the other hand.[7]

Finally, like the trial court, we conclude Patton's termination was not improper. "The propriety of a sanction imposed by an administrative agency is a matter resting in the sound discretion of that agency, and that decision will not be overturned absent an abuse of discretion. [Citations.] 'Neither a trial court nor an appellate court is free to substitute its discretion for that of an administrative agency concerning the degree of punishment imposed.' [Citations.] This rule is based on the rationale that 'the courts should pay great deference to the expertise of the administrative agency in determining the appropriate penalty to be imposed.' [Citation.]" (*Hughes v. Board of Architectural Examiners* (1998) 68 Cal.App.4th 685, 692, fn. omitted.)

Here, the city council found that honesty and truthfulness were "essential character traits in a police officer, whose credibility is in issue in any criminal proceeding." It also found, as noted, that Patton knowingly lied. As such, and given that a police officer is in a "position of trust and the public has a right to the highest standard of behavior from those they invest with the power and authority of a law enforcement officer" (see *Kolender v. San Diego County Civil Service Com.* (2005) 132 Cal.App.4th 716, 721), we conclude neither the city nor the trial court erred in finding Patton's termination was justified.

---

7      In light of our conclusion, we deem it unnecessary to decide whether Patton was also dishonest when she was questioned by deMoet in June 2009 in connection with the department's internal investigation of her or whether substantial evidence supports the finding that Patton falsified her timecard in connection with the April 27 appointment.

## DISPOSITION

The order denying Patton's petition, and the judgment entered thereon, are affirmed. The city to recover its costs of appeal.

BENKE, J.

I CONCUR:

McCONNELL, P. J.

I CONCUR IN THE RESULT:

O'ROURKE, J.

28