Filed 5/10/18

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| BRYAN BLUE et al., | |
| Plaintiffs and Respondents, | C083175 |
| v. | (Super. Ct. No. 34201500187126CUCRGDS) |
| CALIFORNIA OFFICE OF THE INSPECTOR GENERAL et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Raymond M. Cadei, Judge. Reversed in part.

KRONICK, MOSKOVITZ, TIEDEMANN & GIRARD and David W. Tyra for California Office of the Inspector General and Robert A. Barton; Office of the Inspector General, James C. Spurling and Shaun R. Spillane for Defendants and Appellants.

California Correctional Peace Officers Association, Daniel M. Lindsay, Phillip Murray and Justin C. Delacruz for Plaintiffs and Respondents.


This appeal challenges the trial court's partial denial of a special motion to strike pursuant to Code of Civil Procedure section 425.16, the anti-SLAPP statute,[1] directed

---

[1]     Undesignated statutory references are to the Code of Civil Procedure. SLAPP is an acronym for "strategic lawsuit against public participation."

at causes of action arising out of the manner in which defendants, the Office of the Inspector General (OIG) and Robert A. Barton, in his capacity as Inspector General, conducted interviews with five correctional officers who previously worked at High Desert State Prison.  The interviews were conducted as part of an investigation into that institution's "practices . . . with respect to (1) excessive use of force against inmates, (2) internal reviews of incidents involving the excessive use of force against inmates, and (3) protection of inmates from assault and harm by others."  As relevant to this appeal, these individual correctional officers and the California Correctional Peace Officers Association (CCPOA) alleged in their first and second causes of action that defendants violated Penal Code section 6126.5 and Government Code section 3300 et seq. (the Public Safety Officers Procedural Bill of Rights or the Act) by refusing the officers' requests to be represented during the interviews.  The trial court denied the anti-SLAPP motion as to these causes of action, concluding (1) defendants carried their threshold burden of demonstrating the gravamen of these causes of action arose from protected activity, but (2) plaintiffs established a probability of prevailing on the merits of these claims.[2]

We agree defendants carried their burden on the threshold issue, but conclude plaintiffs failed to establish a probability of prevailing on the merits of these causes of action.  We therefore reverse the portion of the trial court's order denying the anti-SLAPP motion with respect to the first and second causes of action and remand the

_____

[2]     The trial court granted defendants' anti-SLAPP motion with respect to plaintiffs' third and fourth causes of action alleging violations of Penal Code sections 6127.3 and 6127.4, governing the Inspector General's issuance and enforcement of subpoenas, concluding plaintiffs were unable to establish a probability of prevailing on the merits of these causes of action.  We mention these causes of action no further.

2

matter to the trial court with directions to enter a new order granting the motion in its entirety and dismissing the complaint.

BACKGROUND

*Oversight Authority of the OIG*

The Legislature created the OIG to oversee the Department of Corrections and Rehabilitation (CDCR). (Pen. Code, § 6125 et seq.) Penal Code section 6126 provides in relevant part:

"(a) The Inspector General shall be responsible for contemporaneous oversight of internal affairs investigations and the disciplinary process of the [CDCR], pursuant to Section 6133 under policies to be developed by the Inspector General.

"(b) When requested by the Governor, the Senate Committee on Rules, or the Speaker of the Assembly, the Inspector General shall review policies, practices, and procedures of the department. The Inspector General, under policies developed by the Inspector General, may recommend that the Governor, the Senate Committee on Rules, or the Speaker of the Assembly request a review of a specific departmental policy, practice, or procedure that raises a significant correctional issue relevant to the effectiveness of the department. When exigent circumstances of unsafe or life threatening situations arise involving inmates, wards, parolees, or staff, the Inspector General may, by whatever means is most expeditious, notify the Governor, Senate Committee on Rules, or the Speaker of the Assembly.

"(c)(1) Upon completion of a review, the Inspector General shall prepare a complete written report, which shall be held as confidential and disclosed in confidence, along with all underlying materials the Inspector General deems appropriate, to the requesting entity in subdivision (b) and the appropriate law enforcement agency.

3

"(2) The Inspector General shall also prepare a public report. When necessary, the public report shall differ from the complete written report in the respect that the Inspector General shall have the discretion to redact or otherwise protect the names of individuals, specific locations, or other facts that, if not redacted, might hinder prosecution related to the review, or where disclosure of the information is otherwise prohibited by law, and to decline to produce any of the underlying materials. Copies of public reports shall be posted on the [OIG]'s Internet Web site." (Pen. Code, § 6126, subds. (a)-(c).)

As explained by Inspector General Barton in his declaration in support of the anti-SLAPP motion, the OIG initially possessed the authority to conduct "criminal and administrative investigations into allegations of CDCR employee misconduct." The Legislature removed this authority effective June 30, 2011 (compare Stats. 2009, ch. 35, § 14 with Stats. 2011, ch. 36, § 36), except in two circumstances: (1) "Upon receiving a complaint of retaliation from an employee against a member of management at the [CDCR], the Inspector General shall commence an inquiry into the complaint and conduct a formal investigation where a legally cognizable cause of action is presented" (Pen. Code, § 6129, subd. (b)(1)); and (2) "The [OIG] shall investigate reports of the mishandling of incidents of sexual abuse, while maintaining the confidentiality of the victims of sexual abuse, if requested by the victim" (Pen. Code, § 2641, subd. (e)). Outside these specific contexts, not applicable in this case, the OIG "has no authority to open investigations into CDCR employees." That authority belongs to CDCR's Office of Internal Affairs (OIA), with the OIG providing public oversight pursuant to Penal Code section 6133.[3] (Pen. Code, § 6126, subd. (a).)

_____

[3] This section provides in full: "(a) The [OIG] shall be responsible for contemporaneous public oversight of the [CDCR] investigations conducted by the [OIA]. To facilitate oversight, the [OIG] shall have staff physically colocated with the [OIA],

4

*Review of High Desert State Prison*

On June 25, 2015, in accordance with Penal Code section 6126, subdivision (b), set forth above, the Senate Rules Committee issued a letter to the inspector general authorizing the OIG "to review the practices at High Desert State Prison . . . with respect to (1) excessive use of force against inmates, (2) internal reviews of incidents involving the excessive use of force against inmates, and (3) protection of inmates from assault and harm by others." The letter requested the inspector general to provide the Committee with "a written report detailing the results of [the] review" and also requested the inspector general "consult with, and recommend appropriate actions to, [OIA] regarding [the] review." As the letter explained, the Committee authorized the review because of various allegations "rais[ing] concern about whether some members of [High Desert

---

within a reasonable timeframe and without any undue delays. The [OIG] shall also be responsible for advising the public regarding the adequacy of each investigation, and whether discipline of the subject of the investigation is warranted. [OIG] shall have discretion to provide public oversight of other [CDCR] personnel investigations as needed. [¶] (b)(1) The [OIG] shall issue regular reports, no less than annually, to the Governor and the Legislature summarizing its recommendations concerning its oversight of the [CDCR] allegations of internal misconduct and use of force. The [OIG] shall also issue regular reports, no less than semiannually, summarizing its oversight of [OIA] investigations pursuant to subdivision (a). The reports shall include, but not be limited to, all of the following: [¶] (A) Data on the number, type, and disposition of complaints made against correctional officers and staff. [¶] (B) A synopsis of each matter reviewed by the [OIG]. [¶] (C) An assessment of the quality of the investigation, the appropriateness of any disciplinary charges, the [OIG's] recommendations regarding the disposition in the case and when founded, the level of discipline afforded, and the degree to which the agency's authorities agreed with the [OIG] recommendations regarding disposition and level of discipline. [¶] (D) The report of any settlement and whether the [OIG] concurred with the settlement. [¶] (E) The extent to which any discipline was modified after imposition. [¶] (2) The reports shall be in a form that does not identify the agency employees involved in the alleged misconduct. [¶] (3) The reports shall be posted on the Inspector General's Internet Web site and otherwise made available to the public upon their release to the Governor and the Legislature." (Pen. Code, § 6133.)

State Prison] staff are engaged in a pattern or practice of using inappropriate and excessive force against inmates and whether there is adequate protection of inmates from harm at the prison." After providing a description of four such allegations, including one alleging "a mobility-impaired inmate" was "assaulted by staff, and consequently required outside medical treatment, for refusing to remove and relinquish footwear worn to assist with his medical condition," the letter continued: "In addition to the specific incidents noted above, there have been general allegations asserted that some members of custodial staff refer to inmates as 'sodomites' or sex offenders in the presence of other inmates and disclosed inmates' commitment offenses to others[,] actions which would place inmates at risk of harm from other inmates."

Upon receiving this letter, Inspector General Barton met with Chief Deputy Inspector General Roy Wesley and other subordinates to plan the review to be undertaken by the OIG. As both Barton and Wesley explained in their declarations, neither considered the Senate's request to call for investigation of specific allegations of employee misconduct, nor would the OIG have statutory authority to conduct such an investigation had that been requested. Both considered the request to call for a broader inquiry into policies and practices in place at High Desert State Prison and "overall staff culture and attitudes" at the prison. Because the latter "could not be gleaned from a review of CDCR's records," they decided to interview former High Desert State Prison staff. As Wesley explained: "We believed current [High Desert State Prison] employees would be reluctant to speak openly with OIG staff out of fear that they would be subjected to retaliation for cooperating with the review. We were also aware that the [OIA] was conducting investigations at [High Desert State Prison] and did not want to interview employees who could be interviewed as potential witnesses in those investigations." Wesley directed a subordinate to identify former employees at the

6

prison, particularly those who worked in the prison's " 'B' Facility, as this is where the majority of the sex offenders and inmates with disabilities were housed."

Thereafter, between June 2015 and December 2015, OIG's Special Assistant Inspectors General (SAIG) "monitored approximately 19 investigations of [High Desert State Prison] staff that were being conducted by the [OIA]" while the office's Deputy Inspectors General "performed all other work in connection with the review of [the prison], which included reviewing CDCR policies, [High Desert State Prison] policies, use-of-force incident reports, inmate complaints, inmate appeals, court documents, and various other CDCR records." The Deputy Inspectors General (DIG) also conducted interviews with former inmates at the prison and former staff members who had transferred to another CDCR prison or were no longer state employees. As Chief Deputy Inspector General Wesley explained: "Because the SAIGs were familiar with the allegations involved in the active OIA investigations they were monitoring and because OIG's review was not intended to uncover staff misconduct, I did not want the SAIGs to conduct any employee or inmate interviews. On the other hand, because the DIGs would not have any knowledge pertaining to these active investigations, I assigned them the task of performing these interviews." Inspector General Barton also spoke to the secretary of CDCR and informed him the former High Desert State Prison employees to be interviewed were not considered "subjects of an investigation" and "would not be asked questions about ongoing investigations."

Both Inspector General Barton and Chief Deputy Inspector General Wesley considered the former staff member interviews to be confidential. (See Pen. Code, § 6126.5, subd. (d) ["Inspector General may require any employee of the [CDCR] to be interviewed on a confidential basis"]; *id*., § 6126.4 ["misdemeanor for the Inspector General or any employee or former employee of the Inspector General to divulge or make

7

known in any manner not expressly permitted by law to any person not employed by the Inspector General any particulars of any record, document, or information the disclosure of which is restricted by law from release to the public"].)  Indeed, the OIG denied a request from an OIA senior special agent for copies of the former staff member interviews.

At the conclusion of the review, on December 16, 2015, the OIG issued a report summarizing its review of High Desert State Prison and making policy recommendations. As Inspector General Barton explained: "The information the OIG obtained during its interviews of staff and inmates served as the basis for the OIG to make the policy recommendations on page 55 of its report that CDCR provide staff with sensitivity training, mindfulness and wellness programs, and programs to recognize and address implicit bias; diversify the workforce at [High Desert State Prison]; increase inmate programming at [the prison]; and take steps to prevent staff from serving in high stress assignments for extended periods of time.  [Citation.]  The report does not contain a single statement indicating any of the plaintiffs had engaged in or were suspected of engaging in misconduct.  The report does not include any of the plaintiffs' names or identify a single person interviewed during the course of the review."  Our review of the report confirms these statements to be accurate.

*Plaintiffs' Lawsuit*

This lawsuit arises from the manner in which five former High Desert State Prison employees were interviewed in connection with the OIG review described above.  More specifically, these employees (Bryan Blue, Jason Hastey, Steven Oschner, Arthur Tovar, and James McCloughan), who still worked for CDCR but at other correctional facilities, and the CCPOA alleged in two causes of action that the OIG and Inspector General Barton violated Penal Code section 6126.5 and the Public Safety Officers Procedural Bill

8

of Rights by refusing each employee's request to be represented during the interviews. We decline to set forth the circumstances of the interviews in any detail. For our purposes, it will suffice to note that each employee requested representation during the interview and the DIG who conducted each interview denied the request and informed the employee he was not under investigation and nothing said would be used to pursue an investigation or recommend an investigation be opened.

<em>Anti-SLAPP Motion</em>

Defendants filed an anti-SLAPP motion arguing plaintiffs' causes of action arose from protected activity under the anti-SLAPP statute because they challenged defendants' communicative conduct, i.e., denial of plaintiffs' requests for representation, "made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" (§ 425.16, subd. (e)(2)), i.e., the Senate-directed review of practices at High Desert State Prison. Defendants also argued plaintiffs' causes of action arose from protected activity because the challenged conduct amounted to "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest" (*id*., subd. (e)(4)). This is so, argued defendants, because publication of a report on an issue of public interest, such as OIG's review of practices related to claims of prisoner abuse at High Desert State Prison, are protected by the constitutional rights of petition and free speech, and "the actions the OIG took during its review *all* qualify as conduct taken in furtherance of publishing [that] report." (Italics added.)

With respect to the second stage of the anti-SLAPP analysis, defendants argued plaintiffs could not demonstrate a probability of prevailing on the merits because the right to representation under the Act applies to a confidential interview the OIG conducts with

9

a CDCR employee only if "it appears that the facts of the case could lead to punitive action" (Pen. Code, § 6126.5, subd. (d)) and the employee "is under investigation and subjected to interrogation . . . that could lead to punitive action" (Gov. Code, § 3303). Here, argued defendants, none of the plaintiff employees were under investigation, "the OIG's interviews were confidential and were not for the purposes of addressing disciplinary action," and the interviews did not cover "matters likely to result in punitive action."

Plaintiffs opposed the anti-SLAPP motion, arguing defendants failed to carry their threshold burden of demonstrating plaintiffs' causes of action arose from protected activity. Plaintiffs argued defendants' statements denying the requests for representation were not "made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" (§ 425.16, subd. (e)(2)) because denying such representation "had no bearing on the issues being considered in OIG's [r]eview of [High Desert State Prison]." Nor did denying such requests amount to "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest" (*id*., subd. (e)(4)), argued plaintiffs, because defendants "were statutorily required to perform the Senate-directed review of [High Desert State Prison]" and therefore plaintiffs' lawsuit will not "have the 'chilling effect' [on the rights of petition or free speech] the anti-SLAPP statute was designed to protect against."

Plaintiffs further argued they possessed a reasonable probability of prevailing on the merits of their causes of action because the appropriate standard for determining whether representation must be allowed under the Act is "whether the employee [being interviewed] has a reasonable basis for believing that answers to the questions could form

10

the basis of disciplinary action" and the individual correctional officer plaintiffs had such a reasonable belief.

*Trial Court Ruling*

The trial court denied the anti-SLAPP motion with respect to plaintiffs' causes of action under Penal Code section 6126.5, subdivision (d), and the Act. As previously mentioned, the trial court concluded (1) defendants carried their threshold burden of demonstrating the gravamen of the causes of action arose from protected activity, but (2) plaintiffs established a probability of prevailing on the merits of these claims. With respect to the threshold issue, the trial court disagreed with defendants' argument that the causes of action challenged any written or oral statement made in connection with an issue under consideration or review in an official proceeding within the meaning of section 425.16, subdivision (e)(2), explaining the claims are "based on the [inspector general's] act of denying representation," not on the communication of that denial to the individual correctional officer plaintiffs. However, the trial court agreed the gravamen of the causes of action arose from other conduct in furtherance of the exercise of the constitutional rights of petition or free speech in connection with a public issue or issue of public interest within the meaning of subdivision (e)(4) because, while defendants are not a media outlet publishing a news report on an issue of public interest, "the California Supreme Court acknowledged that 'governmental entities are entitled to invoke the protections of section 425.16 when such entities are sued on the basis of statements or activities engaged in by the public entity or its public officials in their official capacity.' (*Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 17.)"

Finally, concluding plaintiffs carried their burden of demonstrating a probability of prevailing on the merits, the trial court explained: "Plaintiffs need not show that punitive action will likely occur, but that the action <u>may</u> lead to adverse consequences.

11

Plaintiffs have shown that the questions asked at the interviews may lead to punitive action for failure to report misconduct." In support of this conclusion, the trial court cited paragraph 10 of Arthur Tovar's declaration, in which he states: "Some of the questions caused me some small concern because they involved potential misconduct that I may or may not have observed while a correctional officer at High Desert State Prison. Although I answered truthfully that I did not observe any of the misconduct [the interviewing DIG] asked about, it occurred to me that if I had in fact witnessed such misconduct, I could potentially be implicating myself for misconduct for failure to report the misconduct." The trial court added: "[T]he [inspector general's report] identified several allegations of misconduct [and] urged [High Desert State Prison] and OIA to take action. The fact that the requests to investigate the specific allegations of misconduct all occurred prior to the Plaintiffs' interviews and that Plaintiffs may not have known of the requests is of no import. The evidence demonstrates that interviews conducted by the [OIG] as part of the review <u>could lead, and did lead</u> to investigations of some officers."[4]

DISCUSSION

I

*The Anti-SLAPP Statute*

Section 425.16 provides in relevant part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff

---

[4]    As we explain more fully in the discussion portion of the opinion, the record does not support the conclusion the OIG interviews led to OIA investigations of any officers.

12

will prevail on the claim." (§ 425.16, subd. (b)(1).) "[I]n applying the statute a court generally is required to engage in a two-step process: 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.]" (*Taus v. Loftus* (2007) 40 Cal.4th 683, 712, overruled on another point as stated in *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 380.) " 'The defendant has the burden on the first issue, the threshold issue; the plaintiff has the burden on the second issue. [Citation.]' [Citation.]" (*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 928.)

We review the trial court's ruling de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.) " 'We consider "the pleadings, and supporting and opposing affidavits upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, . . . [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." [Citation.]' [Citation.]" (*Flatley v. Mauro* at p. 326.)

## II

### *The Threshold Issue*

While defendants OIG and Inspector General Barton, the appellants in this appeal, prevailed on the threshold issue below, we begin with this issue because, as the individual correctional officer plaintiffs and CCPOA correctly point out, we may affirm the trial court's denial of the anti-SLAPP motion regardless of their likelihood of prevailing on the merits if we conclude defendants failed to carry their burden of

13

showing the causes of action arose from protected activity.  We conclude defendants have carried that burden.

Only those causes of action "arising from any act . . . in furtherance of the . . . right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" are "subject to a special motion to strike" under the anti-SLAPP statute.  (§ 425.16, subd. (b)(1).)  "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must itself have been an act in furtherance of the right of petition or free speech.  [Citation.]  In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech.  [Citations.]  'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e) . . . .'  [Citations.]"  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78-79, italics omitted.)

Section 425.16, subdivision (e), provides: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

14

Interpreting this subdivision, our Supreme Court has explained: "Clauses (3) and (4) . . . concerning statements made in public fora and 'other conduct' implicating speech or petition rights, include an express 'issue of public interest' limitation; clauses (1) and (2), concerning statements made before or in connection with issues under review by official proceedings, contain no such limitation. In light of this variation in phraseology, it must be presumed the Legislature intended different 'issue' requirements to apply to anti-SLAPP motions brought under clauses (3) and (4) of subdivision (e) than to motions brought under clauses (1) and (2)." (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117.) Thus, subdivision (b)'s reference to "exercise of First Amendment rights 'in connection with a public issue' " was not "meant to function as a separate proof requirement applicable to motions brought under all four clauses of subdivision (e) . . . ." (*Id.* at pp. 1117-1118.) Instead, "if a communication falls within either of the 'official proceeding' clauses, the anti-SLAPP statute applies without a separate showing that a public issue or an issue of public interest is present. [Citations.] In drafting the statute, the Legislature concluded that authorized official proceedings necessarily involve a public issue or an issue of public interest." (*Graffiti Protective Coatings, Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207, 1217; *Briggs*, *supra*, 19 Cal.4th at p. 1118 ["Any matter pending before an official proceeding possesses some measure of 'public significance' owing solely to the public nature of the proceeding, and free discussion of such matters furthers effective exercise of the petition rights section 425.16 was intended to protect"].)

The trial court rejected defendants' argument that plaintiffs' causes of action arose from protected activity within the meaning of clause (2) of section 425.16, subdivision (e), but concluded the causes of action did arise from protected activity within the meaning of clause (4) of that subdivision. Defendants argue both clauses are satisfied,

15

while plaintiffs argue defendants satisfied neither. Because we conclude the trial court correctly determined clause (4) was satisfied, we need not determine whether defendants also satisfied clause (2).

The gathering of information preparatory to publishing a news report or scholarly article qualifies as "other conduct in furtherance of the exercise of . . . the constitutional right of free speech" within the meaning of section 425.16, subdivision (e)(4). This is so regardless of alleged illegality in the manner that information was gathered. (See, e.g., *Taus v. Loftus*, *supra*, 40 Cal.4th at p. 713 [the defendants' investigation into the validity of a scholarly article preparatory to publishing responsive articles, including an interview the plaintiff alleged was fraudulently obtained, was "unquestionably . . . conduct in furtherance of their right of free speech"]; *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 165 [the defendant's newsgathering conduct preparatory to the publishing of a news report, including surreptitious videotape recordings the plaintiff alleged were illegally obtained, was "conduct *in furtherance* of the . . . exercise of its right of free speech," italics added].)

Here, the OIG was asked by the Senate Rules Committee "to review the practices at High Desert State Prison . . . with respect to (1) excessive use of force against inmates, (2) internal reviews of incidents involving the excessive use of force against inmates, and (3) protection of inmates from assault and harm by others." The OIG was also asked to issue "a written report detailing the results of [the] review." The request was made pursuant to Penal Code section 6126, subdivision (b). Subdivision (c)(2) of this section also required the inspector general to "prepare a public report," a copy of which "shall be posted on the [OIG's] Internet Web site." (Pen. Code, § 6126, subd. (c)(2).) Defendants interviewed the individual correctional officer plaintiffs as part of this review of High Desert State Prison. Plaintiffs challenge

16

the manner in which those interviews were conducted. Specifically, they contend defendants violated their rights under the Act by refusing their requests for representation. Thus, the causes of action arise from information gathering preparatory to the publishing of the above-mentioned reports and therefore qualify for protection under section 425.16, subdivision (e)(4), if the OIG's review of High Desert State Prison can be said to be "in connection with a public issue or an issue of public interest." We have no difficulty concluding the alleged mistreatment of prisoners at a California correctional facility qualifies as an issue of public interest.

Nor does it matter the defendants are governmental actors, rather than private individuals or press organizations. In *Vargas v. City of Salinas* (2009) 46 Cal.4th 1 (*Vargas*), the plaintiffs, proponents of a local ballot measure, sued the City of Salinas alleging the City improperly expended public money for certain communications (published on the City's Website, in a newsletter, and in a one-page leaflet) relating to the measure. (*Id*. at pp. 7, 11-13.) The trial court granted the City's anti-SLAPP motion; both the Court of Appeal and our Supreme Court affirmed. (*Id*. at pp. 9, 14.) With respect to the threshold issue of whether the plaintiffs' causes of action arose from protected activity, our Supreme Court first addressed the plaintiffs' argument that the communications did "not constitute 'protected activity' within the meaning of the anti-SLAPP statute" because "the communications . . . are those of a *governmental entity rather than a private individual or organization*." (*Id*. at p. 16.) The plaintiffs argued the communications "cannot properly be viewed as 'acts . . . in furtherance of the person's right of petition or free speech under the United States or California Constitution because . . . *government speech*, unlike that of a private individual or organization, is not protected by the First Amendment of the federal Constitution or article I, section 2 of the California Constitution." (*Id*. at pp. 16-17.)

Rejecting this argument, the court noted, "a long and uniform line of California Court of Appeal decisions explicitly holds that governmental entities are entitled to invoke the protections of section 425.16 when such entities are sued on the basis of statements or activities engaged in by the public entity or its public officials in their official capacity[.]" (*Vargas*, *supra*, 46 Cal.4th at p. 17, citing *Bradbury v. Superior Court* (1996) 49 Cal.App.4th 1108, 1113-1116; *Schroeder v. Irvine City Council* (2002) 97 Cal.App.4th 174, 183-184; *San Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Assn.* (2004) 125 Cal.App.4th 343, 353; *Tutor-Saliba Corp. v. Herrera* (2006) 136 Cal.App.4th 604, 609; *Santa Barbara County Coalition Against Automobile Subsidies v. Santa Barbara County Assn. of Governments* (2008) 167 Cal.App.4th 1229, 1237-1238; *Schaffer v. City and County of San Francisco* (2008) 168 Cal.App.4th 992, 1001-1004.) Declining to overrule these decisions, the court held: "Whether or not the First Amendment of the federal Constitution or article I, section 2 of the California Constitution *directly* protects government speech in general or the types of communications of a municipality that are challenged here—significant constitutional questions that we need not and do not decide—we believe it is clear, in light of both the language and purpose of California's anti-SLAPP statute, that the statutory remedy afforded by section 425.16 extends to statements and writings of governmental entities and public officials on matters of public interest and concern that would fall within the scope of the statute if such statements were made by a private individual or entity." (*Vargas, supra,* 46 Cal.4th at p. 17.)

The court explained that while "plaintiffs' argument . . . rests on the language of section 425.16, *subdivision (b),* which describes the type of cause of action that is subject to a motion to strike as '[a] cause of action . . . arising from any act . . . *in furtherance of the person's right of petition or free speech under the United States*

*or California Constitution in connection with a public issue*[,]' . . . section 425.16, *subdivision (e)* goes on to define this statutory phrase in very broad terms . . . [without] purport[ing] to draw any distinction between (1) statements by private individuals or entities that are made in the designated contexts or with respect to the specified subjects, and (2) statements by governmental entities or public officials acting in their official capacity that are made in these same contexts or with respect to these same subjects.  Although there may be some ambiguity in the statutory language, section 425.16, subdivision (e) is most reasonably understood as providing that the statutory phrase in question includes *all* such statements, without regard to whether the statements are made by private individuals or by governmental entities or officials." (*Vargas*, *supra*, at pp. 17-18.)  The court further explained, "to the extent there may ever have been a question whether the anti-SLAPP protections of section 425.16 may be invoked by a public entity, that question clearly was laid to rest by the Legislature's enactment of . . . section 425.18, subdivision (i), in 2005—well after many of the Court of Appeal decisions noted above [citations] had expressly recognized the ability of public entities to bring a motion to strike under the anti-SLAPP statute.  Section 425.18, subdivision (i)—a provision of the 2005 legislation dealing with so-called SLAPPback actions—expressly recognizes that a 'SLAPPback' action may be 'filed by a public entity,' thereby necessarily confirming that a public entity may prevail on a special motion to strike under section 425.16."  (*Id*. at p. 18.)

Finally, the court also noted, "the purpose of the anti-SLAPP statute plainly supports an interpretation that protects statements by governmental entities or public officials as well as statements by private individuals," explaining: "In setting forth the purpose of the statute and the Legislature's intent guiding its interpretation, section 425.16, subdivision (a) states in relevant part: 'The Legislature finds and declares that it

19

is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. *To this end, this section shall be construed broadly*.' (Italics added.) Moreover, the legislative history indicates that the Legislature's concern regarding the potential chilling effect that abusive lawsuits may have on statements relating to a public issue or a matter of public interest extended to statements by public officials or employees acting in their official capacity as well as to statements by private individuals or organizations." (*Vargas*, *supra*, at pp. 18-19, fn. omitted.)

Here, plaintiffs' causes of action do not arise out of the publishing of the OIG report on practices at High Desert State Prison, but rather out of defendants' information gathering preparatory to the publishing of that report. However, as we have already explained, such conduct would "unquestionably [amount to] conduct in furtherance of their right of free speech" (*Taus v. Loftus*, *supra*, 40 Cal.4th at p. 713) "if [engaged in] by a private individual or entity." (*Vargas*, *supra*, at p. 17.) Thus, the reasoning of *Vargas* applies, as does the statutory remedy afforded by section 425.16.

Nevertheless, relying on *Anderson v. Geist* (2015) 236 Cal.App.4th 79 (*Anderson*), plaintiffs argue, "this lawsuit is unlikely to have the effect of chilling [defendants'] public participation" because "they were statutorily required to perform the Senate-directed review of [High Desert State Prison]." *Anderson* is distinguishable. There, the plaintiff sued two sheriff's deputies alleging they unlawfully entered her residence while executing a recalled bench warrant for her daughter's arrest and made defamatory statements to her neighbors while doing so. (*Id*. at p. 82.) Thus, the causes of action arose out of the deputies' execution of the warrant. The Court of Appeal held, "at least under the circumstances of this case," the execution of such a warrant was not protected activity under the anti-SLAPP statute. (*Ibid*.) The court explained: "Execution of an

arrest warrant is of course 'an act in furtherance of a criminal prosecution,' as defendants put it. But that does not necessarily make it 'conduct in furtherance of the exercise of the constitutional right of petition' in the meaning of section 425, subdivision (e)(4). At base, the execution of a warrant is not an exercise of rights by the peace officer; it is the performance of a mandatory duty, at the direction of the court. [Citation.] Because peace officers have no discretion in whether or not to execute a warrant issued by the court, it seems unlikely that a lawsuit asserting claims arising from such activity could have the chilling effect that motivated the Legislature to adopt the anti-SLAPP statute, or that extending protections of the anti-SLAPP statute to such activity would serve the statute's goals." (*Id*. at pp. 86-87.) The court further explained, "to qualify for protection under section 425.16, subdivision (e)(4), the conduct at issue must be 'in connection with a public issue or an issue of public interest'—that is, it must 'concern[ ] a topic of widespread public interest and contribute[ ] in some manner to a public discussion of the topic.' [Citations.] In their briefing on appeal, defendants fail to make any argument as to why their execution of a warrant in the circumstances of this case—a routine misdemeanor warrant in a case that apparently attracted precisely zero public interest or discussion—might meet this standard, and we find nothing in the record that might support an argument to that effect." (*Id*. at p. 87.)

Here, in contrast to *Anderson, supra*, 236 Cal.App.4th 79, the OIG's review of High Desert State Prison concerned a topic of widespread public interest and the report issued to the Senate and published on the OIG Website contributes to a public discussion of the topic. Not only would the publishing of those reports be protected by the state and federal Constitutions had they been published by a private individual or entity, but the information gathering preparatory to their publication would also be covered. (*Taus v. Loftus*, *supra*, 40 Cal.4th at p. 713) These causes of action arise out of that information

21

gathering conduct. And because such conduct "would fall within the scope of the statute if [engaged in] by a private individual or entity" (*Vargas*, *supra*, at p. 17), the fact defendants are instead governmental entities does not strip them of the statute's protection. Nor are we persuaded the mandatory duty of the inspector general to undertake the review of High Desert State Prison upon receipt of the Senate's request vitiates the statute's protection.

Despite the inspector general's mandatory duty to conduct the review of High Desert State Prison, were we to hold causes of action arising out of the OIG's information gathering during the course of that review are not subject to the anti-SLAPP statute, this may well inhibit the manner in which such reviews are undertaken. In other words, had the defendants known they would be required to defend against meritless claims arising out of their interviews with the individual correctional officer plaintiffs without the ability to have those claims stricken at an early stage in the proceedings under the anti-SLAPP statute, it is entirely possible they would have conducted the review without interviewing those plaintiffs at all, and thereby would have lost valuable information forming at least part of the basis for a number of the OIG's recommendations regarding policy improvements at High Desert State Prison. Simply put, public discussion of this important issue may well have been chilled.

### III

#### *Probability of Prevailing on the Merits*

We now explain why plaintiffs have not demonstrated a probability of prevailing on their causes of action under Penal Code section 6126.5 and the Public Safety Officers Procedural Bill of Rights.

Penal Code section 6126.5 provides in relevant part: "The Inspector General may require any employee of [CDCR] to be interviewed on a confidential basis. Any

22

employee requested to be interviewed shall comply and shall have time afforded by the appointing authority for the purpose of an interview with the Inspector General or his or her designee.  The Inspector General shall have the discretion to redact the name or other identifying information of any person interviewed from any public report issued by the Inspector General, where required by law or where the failure to redact the information may hinder prosecution or an action in a criminal, civil, or administrative proceeding, or where the Inspector General determines that disclosure of the information is not in the interests of justice.  *It is not the purpose of these communications to address disciplinary action or grievance procedures that may routinely occur.  If it appears that the facts of the case could lead to punitive action, the Inspector General shall be subject to Sections 3303, 3307, 3307.5, 3308, 3309, and subdivisions (a) to (d), inclusive, of Section 3309.5 of the Government Code as if the Inspector General were the employer*, except that the Inspector General shall not be subject to the provisions of any memorandum of understanding or other agreement entered into between the employing entity and the employee or the employee's representative that is in conflict with, or adds to the requirements of, Sections 3303, 3307, 3307.5, 3308, 3309, and subdivisions (a) to (d), inclusive, of Section 3309.5 of the Government Code."  (Pen. Code, § 6126.5, subd. (d), italics added.)

The provisions listed in Penal Code section 6126.5, subdivision (d), to which the inspector general is subject "[i]f it appears that the facts of the case could lead to punitive action," are part of the Public Safety Officers Procedural Bill of Rights.  "The Act requires that law enforcement agencies throughout the state afford minimum procedural rights to their peace officer employees."  (*Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 572.)  To that end, Government Code section 3303 provides, "[w]hen any public safety officer is *under investigation* and *subjected to*

23

*interrogation* by his or her commanding officer, or any other member of the employing public safety department, *that could lead to punitive action*, the interrogation shall be conducted under the following conditions.  For the purpose of this chapter, punitive action means any action that may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment."  (Italics added.) Subdivision (i) of this section provides: "Upon the filing of a formal written statement of charges, or *whenever an interrogation focuses on matters that are likely to result in punitive action against any public safety officer, that officer, at his or her request, shall have the right to be represented by a representative of his or her choice who may be present at all times during the interrogation*.  The representative shall not be a person subject to the same investigation.  The representative shall not be required to disclose, nor be subject to any punitive action for refusing to disclose, any information received from the officer under investigation for noncriminal matters. [¶] *This section shall not apply to any interrogation of a public safety officer in the normal course of duty, counseling, instruction, or informal verbal admonishment by, or other routine or unplanned contact with, a supervisor or any other public safety officer*, nor shall this section apply to an investigation concerned solely and directly with alleged criminal activities."  (Gov. Code, § 3303, subd. (i), italics added.)

The published decisions addressing the question of whether or not the right to representation was triggered under the Act do not involve the overlay of Penal Code section 6126.5 present in this case.  However, they are instructive with respect to the scope of the right to representation set forth in Government Code section 3303.  This section requires the officer invoking the right to representation must be (1) "under investigation" and (2) "subjected to interrogation . . . that could lead to punitive action" (Gov. Code, § 3303), i.e., the "interrogation focuses on matters that are likely to result in

24

punitive action against . . . that officer" (*id*., subd. (i)).[5]  For example, in *Paterson v. City of Los Angeles* (2009) 174 Cal.App.4th 1393, as part of an investigation into suspicions that a police officer was abusing sick leave, a supervising officer was sent to his home to conduct a "sick check."  Neither the officer suspected of violating department sick leave policies nor his wife, also a police officer, was home at the time.  The supervising officer called the suspected officer's cell phone and spoke to both him and his wife, both of whom lied during the conversation and were temporarily relieved from duty for making false statements to a supervisor.  The disciplined officers sued the city alleging, among other causes of action, violation of the Act.  (*Id*. at pp. 1396-1398.)  Reversing the trial court's grant of summary adjudication in favor of the city as to this cause of action, the Court of Appeal explained the Act applied because the sick check was conducted as part of "an investigation of abuse of sick leave" and "it is easy to determine that the sick check might have led to punitive action, because it did lead to punitive action."  (*Id*. at pp. 1401-1402.)

In contrast, *Steinert v. City of Covina* (2006) 146 Cal.App.4th 458 involved a situation in which the plaintiff police officer was questioned by her supervisor concerning her typing the wrong designation while conducting a criminal records search, i.e., "TRNG," indicating training, rather than the applicable crime report number.  During that conversation, when asked whether she had provided any confidential information

---

[5]     As quoted fully above, subdivision (i) states, "whenever an interrogation focuses on matters that are likely to result in punitive action against *any* public safety officer, *that officer*, at his or her request, *shall have the right to be represented* by a representative of his or her choice who may be present at all times during the interrogation." (Gov. Code, § 3303, subd. (i), italics added.)  Thus, while the subdivision begins by stating the interrogation must focus on matters likely to result in punitive action against "any public safety officer," it is "that officer," i.e., the one against whom punitive action is likely to result from the interrogation, who possesses the right to representation.

discovered during the records search to the reporting party, the officer said she had not done so. This was later determined to be a lie and led to her dismissal. (*Id*. at pp. 460-461.) The trial court determined the conversation with the supervisor did not trigger the right to representation under the Act. The Court of Appeal affirmed, concluding substantial evidence supported that determination. The court explained that neither the supervisor nor the department's support services manager believed there was anything improper about the records search or that the officer had improperly given out confidential information. The only suspicion at the time of the conversation was the officer's improper use of "TRNG" as the search designation, but according to both the supervisor and the support services manager such "mislabeling was not a substantial rule violation" that would lead to punitive action, but was rather a "simple training issue." (*Id*. at pp. 462-463.) Thus, the officer was not "under investigation" and "subjected to interrogation . . . that could lead to punitive action." (Gov. Code, § 3303.) Instead, the conversation was the sort of "interrogation of a public safety officer in the normal course of duty, counseling, instruction, or informal verbal admonishment by, or other routine or unplanned contact with, a supervisor" (*id*., subd. (i), that does not trigger the right to representation under the Act. (*Steinert v. City of Covina*, *supra*, 146 Cal.App.4th at p. 465.)

Here, none of the individual correctional officer plaintiffs who were interviewed in connection with the OIG's review of High Desert State Prison were "under investigation" *for anything*, let alone something "that could lead to punitive action." (Gov. Code, § 3303.) For this reason alone, assuming their interviews can reasonably be considered "interrogation" at all, this was not the sort of "interrogation [that] focuses on matters that are likely to result in punitive action" against the officers being interviewed. (*Id*., subd. (i).) Instead, these officers were interviewed because they previously worked at

26

High Desert State Prison, specifically in the section of the prison that housed the majority of sex offenders and inmates with disabilities. While the Senate's letter authorizing the OIG's review of the prison recounted a number of allegations of abuse made by these classes of inmates, as both Inspector General Barton and Chief Deputy Inspector General Wesley explained in their declarations, neither considered the Senate's request to call for investigation of specific allegations of employee misconduct, nor would the OIG have statutory authority to conduct such an investigation had that been requested. Both considered the request to call for a broader inquiry into policies and practices in place at High Desert State Prison and "overall staff culture and attitudes" at the prison. Moreover, while the OIG was also monitoring 19 active OIA investigations, none of the plaintiffs were considered "potential witnesses in those investigations." From this, it can be inferred that these plaintiffs were also not the subjects of the active investigations. Additionally, those active investigations were monitored by SAIGs, whereas plaintiffs were interviewed by DIGs with no knowledge pertaining to the investigations.

Nor is there any support in the record for the trial court's conclusion that plaintiffs' interviews led to "investigations of some officers." Indeed, both Inspector General Barton and Chief Deputy Inspector General Wesley explained in their declarations that they considered the interviews with plaintiffs to be confidential. In line with this understanding, the OIG denied a request from an OIA Senior Special Agent for copies of the interviews. Indeed, the report the OIG ultimately submitted to the Senate does not "contain a single statement indicating any of the plaintiffs had engaged in or were suspected of engaging in misconduct" or "include any of the plaintiffs' names or identify a single person interviewed during the course of the review."

In short, the individual correctional officer plaintiffs were neither "under investigation" nor "subjected to interrogation . . . that could lead to punitive action." (Gov. Code, § 3303.) Nor does the overlay of Penal Code section 6126.5, subdivision (d), alter this result. Subdivision (d) confirms the purpose of an inspector general interview with a CDCR employee is not "to address disciplinary action or grievance procedures that may routinely occur." (Pen. Code, § 6126.5, subd. (d).) Nevertheless, "[i]f it appears that the facts of the case *could lead to punitive action*, the Inspector General shall be subject to Section[] 3303 . . . of the Government Code *as if the Inspector General were the employer*." (*Ibid*., italics added.) For the reasons already expressed, we conclude it would not have appeared to either the inspector general or to a reasonable person in plaintiffs' position that these confidential interviews could have led to punitive action against plaintiffs, particularly since they were neither under investigation for any potential misconduct nor questioned as potential witnesses in any active OIA investigation.

Finally, plaintiffs' reliance on *N.L.R.B. v. J. Weingarten, Inc.* (1975) 420 U.S. 251 [43 L.Ed.2d 171] (*Weingarten*) is unpersuasive. There, the United States Supreme Court held: "The action of an employee in seeking to have the assistance of his [or her] union representative at a confrontation with his [or her] employer clearly falls within the literal wording of [section 7 of the National Labor Relations Act] that '(e)mployees shall have the right . . . to engage in . . . concerted activities for the purpose of . . . mutual aid or protection.' [Citation.] This is true even though the employee alone may have an immediate stake in the outcome; [the employee] seeks 'aid or protection' against a perceived threat to his [or her] employment security. The union representative whose participation [is sought] is, however, safeguarding not only the particular employee's interest, but also the interests of the entire bargaining unit by exercising vigilance to

28

make certain that the employer does not initiate or continue a practice of imposing punishment unjustly." (*Id*. at pp. 260-261.) The court went on to explain: "Requiring a lone employee to attend an investigatory interview which he [or she] reasonably believes may result in the imposition of discipline perpetuates the inequality the [National Labor Relations Act] was designed to eliminate . . . ." (*Id*. at p. 262.) Noting a number of appellate decisions have considered *Weingarten* to be " 'persuasive authority' when construing [the Public Safety Officers Procedural Bill of Rights]" (*Ellins v. City of Sierra Madre* (2016) 244 Cal.App.4th 445, 454-455), plaintiffs argue the appropriate standard is whether or not *they* reasonably believed punitive action could result from the interviews with the OIG, and *not* whether or not punitive action would actually result therefrom in light of the inspector general's subjective intent.

We agree the test is an objective one. In this case, it turns on whether or not a reasonable person in the plaintiffs' position, having been informed by the interviewer that he or she was not under investigation for any potential wrongdoing, would nevertheless believe he or she was "under investigation" for something "that could lead to punitive action" (Gov. Code, § 3303), or that "the facts of the case could lead to punitive action" against him or her. (Pen. Code, § 6126.5, subd. (d).) As we have already explained, a reasonable person in plaintiffs' position would not have so believed. Moreover, nothing in *Weingarten* erases the requirement that the officer must actually be "under investigation." (Gov. Code, § 3303; *id*., subd. (i).) In that case, the employee in question was under investigation for stealing food from her employer and therefore had a reasonable basis to believe an interrogation focusing on that alleged misconduct could result in the imposition of discipline against her. (*Weingarten*, *supra*, at p. 255.) Here, none of the individual correctional officer plaintiffs were under investigation for any suspected misconduct. They were so informed. Thus, none of them had a reasonable

29

basis to believe their interviews with the OIG "could lead to punitive action" against them.

The anti-SLAPP motion should have been granted with respect to the first and second causes of action.

DISPOSITION

The portion of the trial court's order denying the anti-SLAPP motion with respect to the first and second causes of action is reversed and vacated. The trial court is directed to enter a new order granting the motion in its entirety and dismissing the complaint. Because defendants should have prevailed on the anti-SLAPP motion, they are entitled to fees and costs incurred both in the trial court and on appeal, to be determined by the trial court. (Code Civ. Proc., § 425.16, subd. (c); *Anschultz Entertainment Group, Inc. v. Snepp* (2009) 171 Cal.App.4th 598, 643.)


                                /s/
                            HOCH, J.


We concur:


     /s/
RAYE, P. J.


     /s/
HULL, J.